## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-CA-00661-SCT

*HOPEWELL ENTERPRISES, INC., BILLY E. HAMMONS AND BETTY P. HAMMONS*

*v.*

*TRUSTMARK NATIONAL BANK*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/10/93 |
| TRIAL JUDGE: | HON. DONALD B. PATTERSON |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | PAUL ANDERSON KOERBER |
| ATTORNEY FOR APPELLEE: | OLEN C. BRYANT, JR. |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 9/12/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/3/96 |

**BEFORE SULLIVAN, P.J., McRAE AND SMITH, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Trustmark National Bank, hereinafter (bank), brought a judicial foreclosure action against Billy and Betty Hammons, hereinafter (Hammons), in the Chancery Court of Copiah County due to a default on a note and deed of trust involving property which contained the Hammons' residence and a 1.5 acre adjoining tract of property upon which was located an artesian water well. The water well became the primary subject of this dispute.

¶2. The Hammons filed a counterclaim for breach of fiduciary duties, interference with an advantageous relationship, wrongful utilization of the bank's superior bargaining position, and reckless disregard of their rights and for gross negligence.

¶3. The Chancellor found no actual damage by Trustmark, but awarded nominal damages of $100 and $25,000 punitive damages to the Hammons. He also awarded Trustmark a judgment of $41,512 for the principal and interest on the note and $18,252.79 attorneys fees and court costs on the judicial

foreclosure of the deed of trust. Aggrieved, the Hammons appeal to this Court and Trustmark cross appeals with the following issues presented:

**WHETHER A CONFIDENTIAL/FIDUCIARY RELATIONSHIP EXISTED BETWEEN THE BANK AND THE HAMMONS, SO AS TO HAVE BEEN VIOLATED BY CERTAIN DISCLOSURES MADE BY THE BANK?**

**WHETHER TRUSTMARK WRONGFULLY INTERFERED WITH ANY BUSINESS RELATIONSHIP OF HAMMONS?**

**WHETHER TRUSTMARK ENTERED INTO AN ORAL LOAN AGREEMENT WITH THE HAMMONS?**

**WHETHER TRUSTMARK HAD A DUTY TO FURNISH TO HAMMONS A COPY OF THE ALLEGED APPRAISAL OF THE WATER WELL?**

**WHETHER HAMMONS SUFFERED ANY ACTUAL DAMAGE DUE TO TRUSTMARK'S ALLEGED ACTIONS, AND IF NOT, WHETHER PUNITIVE DAMAGES MAY BE SUPPORTED BY AN AWARD OF NOMINAL DAMAGES?**

### *STATEMENT OF FACTS*

¶4. In 1986, Billy and Betty Hammons purchased a certain tract of land which is the subject of this dispute. In the course of building a dwelling, Billy successfully drilled a water well. Billy had the water analyzed, and it was determined that the water was pure and drinkable straight from the well, thus making it commercially marketable and valuable.

¶5. The Hammons then decided to market their new found treasure. However, lacking business sophistication, they enlisted the help of Charles King and Tom Allain who purportedly promised to put up the necessary funds to pursue the marketing of the artesian well. In January 1989, the Hammons, King and Allain established Hopewell Enterprises, Inc. as the mechanism for selling the bottled artesian water. The Hammons maintained a fifty-one percent ownership of the stock of the corporation, and King and Allain collectively owned forty-nine percent. The well site was surveyed into a 1.5 acre tract of land and was deeded to Hopewell. This was done with the intent to procure a $250,000 loan from the Georgetown, Mississippi branch of Trustmark Bank, in order to market the water.

¶6. On February 13, 1989, Hopewell obtained a loan of approximately $12,000 from the Bank, and secured the indebtedness with a deed of trust on the 5500 gallon tank purchased with its proceeds. This loan was payable in 365 days from the date of the loan origination.

¶7. On April 3, 1989, the Hammons mortgaged their remaining land (i.e. not the 1.5 acres upon which the well is situated) for a loan of approximately $24,000. This loan was payable in 35 installments of $288.00 a month, with a balloon payment on April 10, 1992.

¶8. During 1989 King and Allain failed to live up to their end of the bargain to market the water. Their inaction resulted in a lawsuit in 1990 between the partners.

¶9. In the meantime, the Hammons began negotiations with Darryl Stripling in early 1990. Stripling was interested in purchasing the artesian well. Stripling offered to purchase all of the water flowing from the well at a price of five (.05) cents per gallon. On May 17, 1990, Stripling paid a visit to the Hammons. According to the Hammons, Stripling was knowledgeable concerning the balance for the amounts of monies due and owing by them to Trustmark, including interest and late fees. The Hammons then contacted Robert Bounds, the President of the Hazelhurst branch of Trustmark National Bank, whom the Hammons claimed apologized to them for having disclosed that information. Bounds admits that he divulged information to Stripling about the approximate amount of both the Hopewell debt, which was in default, and the Hammons debt, which was not in default. However, Bounds did not believe that he had disclosed any confidential information as both debts were a matter of public record. The Hammons further testified that Bounds challenged Stripling as to "why buy the well from the Hammons, when he could buy it from the bank on the courthouse steps?" Bounds denied making this statement. Robert Windham, a Trustmark Officer, testified that it was bank policy not to discuss the business of its customers with third parties. In any event, the discussions between the Hammons and Stripling never resulted in a contract.

¶10. On May 2, 1990, Trustmark had already filed suit against Hopewell, King, Allain and the Hammons, on the $12,000 note which had matured in February 1990. A default judgment was taken against Hopewell, King and Allain. Trustmark claims that in order to stall the collection of the defaulted Hopewell note, Billy Hammons told the bank about his negations with Stripling. Thus, Bounds became aware of the Stripling offer, and gave the debt status to Stripling in an effort to consummate the deal between Stripling and the Hammons.

¶11. The Hammons sued King and Allain on March 13, 1990. The case between the Hammons, King, and Allain was not adjudicated until September 7, 1990, wherein it was agreed that King and Allain would transfer back their 49% interest to the Hammons in exchange for the amount of money they had invested into Hopewell. It was also agreed that the Hammons would assume the previously executed $12,000 note. The Hammons did not have sufficient funds to pay King and Allain and therefore, they paid $15,000 immediately, with $5,000 to be paid within one year of the judgment. King and Allain accepted the $15,000, and assigned the $5,000 amount to their attorney, Brent Bourland. To facilitate this September 7, 1990 judgment, Trustmark offered to restructure the loans. Trustmark claims that it did not resort to execution of the judgment on the Hopewell debt, because the bank had obtained partial satisfaction of the judgment through execution or garnishment issued against Allain and King.

¶12. A new loan which would pay off all amounts owed to King and Allain and consolidate any and all other indebtedness they had with Trustmark into one note was proposed. Trustmark secured this new indebtedness with deeds of trust on the tract of land containing the Hammons residence and upon the tract of land holding the artesian well.

¶13. On October 26, 1990, the Hammons executed a promissory note to Trustmark confirming a debt of $42,267.02, payable in 90 days. This note matured in January 1991. The Hammons subsequently paid the interest and the note was renewed with a May 1991 maturity date. After the note matured, the Hammons again paid the interest and the note was renewed for 116 days. On the September 1991 maturity date, the Hammons were unable to pay, and the note was in default.

¶14. While the Hammons continued to extend the maturity and payoff date of the note they sold the water on their own, while unsuccessfully attempting to strike deals with prospective buyers. In October 1991, Trustmark commenced foreclosure of the Hopewell and Hammons deeds of trust with sale scheduled for November 1991. However, foreclosure proceedings were interrupted by Hopewell filing Chapter 11 bankruptcy and the Hammons Chapter 13 bankruptcy.

¶15. While the bankruptcy was pending, Trustmark elected to have the well appraised. Darrell W. Schmitz, a geologist at Mississippi State University, conducted an investigation/appraisal, and approximated the value of the well at roughly $3.5 million dollars. However, the bank did not consider the appraisal reliable because it failed to consider development and marketing costs associated with the well. Bounds testified that the evaluation was made for foreclosure purposes only. The Hammons made several requests for a copy of the Schmitz evaluation, but Trustmark refused to produce a copy because it considered the report to be bank property. The bankruptcy petitions filed by Hopewell and the Hammons were dismissed in January 1992, and thus, Trustmark was able to file the present suit on January 24, 1992.

¶16. The Chancellor found the facts to be essentially the same as stated above. Specifically the Chancellor found that the Hopewell-Hammons note was in default, and awarded Trustmark $41,512 on the principal of the note, and $18,252.79 in attorneys fees. The trial court also found that Trustmark was also entitled to foreclose on the Hopewell-Hammons deed of trust. The lower court held that there was no fiduciary relationship, but did find that the bank breached its duty not to disclose confidential information. Moreover, the trial court held that Trustmark should have furnished a copy of the appraisal to the Hammons. The court found no actual damages by Trustmark, but nevertheless, awarded $100.00 nominal damages and $25,000.00 punitive damages.

## DISCUSSION OF LAW

### A. Fiduciary Relationship

¶17. This Court has never held that the relationship between a mortgagor and mortgagee is a fiduciary one. *First American National Bank of Iuka v. Mitchell*, 359 So. 2d 1376 (Miss. 1978); *First National Bank of Vicksburg v. Caruthers*, 443 So. 2d 861 (Miss. 1983). At best, we have held that a mortgagor and mortgagee are in a relationship of trust and that a mortgagee should not be allowed to abuse that relationship. *First American National Bank of Iuka v. Mitchell*, 359 So. 2d 1376 (Miss. 1978) (involving fraud committed by a bank officer when forcing the mortgagor to sell the farm under threat of foreclosure to a purchaser selected by the bank officer); *Accord* *Lowery v. Guaranty Bank and Trust Co.*, 592 So. 2d 79 (Miss. 1991) (in credit life insurance cases, a fiduciary relationship between bank and consumer borrower may be established on basis of contract, agency, or reposing of trust and confidence). This Court has implied "that there may be a fiduciary relationship between the bank and its mortgagor due to the character [of the relationship] over the years . . . . [However, w]e hold here that FANB at least owed a duty of fairness which it violated." *Mitchell,* 359 So. 2d at 1380.

¶18. *Mitchell* does not establish that banks and its debtors are in a "fiduciary" relationship as a matter of law, since the Court noted that generally the relationship between a debtor and creditor is a contractual one, and "not a confidential or fiduciary one." *Id*. at 1380; *First National Bank of Vicksburg v. Caruthers*, 443 So. 2d 861, 864 (Miss. 1983) ("right of persons to contract is

fundamental to our jurisprudence, and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties").

¶19. Nonetheless, we have previously stated that [f]iduciary relationship is a very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another." *Lowery v. Guaranty Bank and Trust Co.*, 592 So. 2d 79,83 (Miss. 1991).

> Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character. The basis of this relationship need not be legal; it may be moral, domestic, or personal. Nor is the law concerned with the source of such relationship. These principles are universally affirmed by courts.

*Hendricks v. James*, 421 So. 2d 1031, 1041 (Miss. 1982) (citations omitted)(does not deal with banks, with fiduciary character of family relationships). Nor is *Merchants & Planters Bank v. Williamson*, No. 91-CA-00615 (Miss. January 12, 1995), of any aid to the Hammons argument. The actions of the bank officers in *Williamson* are clearly distinguishable from those of the Trustmark loan officers, who conducted themselves in accordance with customary business practices.

¶20. In this case, the Chancellor held that a fiduciary relationship did not exist, nor did the Hammons establish that a trust was created. The Hammons also failed to prove that they established a trust in the bank or that the bank was aware that a trust was being reposed. We agree with the Chancellor. A mortgagee-mortgagor relationship is not a fiduciary one as a matter of law, nor are there sufficient facts in the case *sub judice* to create a fiduciary relationship.

¶21. Although every contractual agreement does not give rise to a fiduciary relationship, such relationship may exist under the following circumstances: (1) the activities of the parties go beyond their operating on their own behalf, and the activities for the benefit of both; (2) where the parties have a common interest and profit from the activities of the other; (3) where the parties repose trust in one another; and (4) where one party has dominion or control over the other. *Carter Equipment Co. v. John Deere Industrial and Equipment Co.*, 681 F. 2d 386 (5th Cir. 1982).

¶22. The record below establishes that the relationship between the Hammons and Trustmark was simply an arms length business transaction involving a normal debtor-creditor relationship. Moreover, Trustmark had nothing to gain from the success or failure of Hopewell, as the loan agreement fixes the contractual terms, nor did the Hammons repose any trust in the Trustmark officers. Lastly, the record does not indicate that Trustmark exercised dominion and control over the Hammons. Simply put, the Hammons failed to satisfy the requisite elements of a fiduciary relationship. Therefore, we hold that the Chancellor was not erroneous in finding that a fiduciary relationship did not exist.

## B. Breach of Duty of Confidentiality

¶23. The Chancellor held that Trustmark owed a duty of confidentiality to the Hammons. In so far, the trial court relied upon, *Mitchell, supra*, and *Rubenstein v. South Denver National Bank*, 726

P.2d 755 (Colo.App. 1988). Essentially, the Chancellor believed Trustmark could not disclose information found regarding the Hammon's loan to a third party (Stribling) simply because that information was a matter of public record.

¶24. We hold that *Mitchell* does not impose a duty of confidentiality in a debtor-creditor relationship. At most, a duty of trust may arise in some circumstances. *Mitchell*, *supra*. Here, such circumstances are not present and therefore no duty of confidentiality existed. While *Rubenstein* imposes a duty of confidentiality upon banks, it only does within the bank-depositor relationship. Moreover, *Rubenstein* does not impose an absolute duty of confidentiality. Thus, *Rubenstein* stands only for the proposition that information regarding deposits made by a bank customer are to remain confidential. Because the case *sub judice* involves a bank-borrower relationship no duty of confidentiality exists.

¶25. Trustmark asserts that either there is an absolute duty of confidentiality, or there is none. Essentially, the bank argues that all mortgagors know and that mortgages are a matter of public record and thus, there is no expectation of confidentiality regarding the amount of the debt, the amount of the payments, or the term of the loan payout. Again, this situation is clearly distinguishable from one involving customer deposits in a bank where the amounts deposited are expected to remain confidential.

¶26. We agree with Trustmark. We note that holding a bank liable for divulging information that is a matter of public record places a bank in a precarious situation when giving credit information to credit reporting agencies. We also note that disclosures by Trustmark were made only to Stripling, an individual who had previously been identified to the bank by Billy Hammons as a party with whom the Hammons were engaged in business negotiations, which included the assumption of the bank's debt. Furthermore, the Hammons were in default, and suit had been filed by the bank, therefore the note itself was a matter of public record. Moreover, the Hammons' own suit against King and Allain stated the amount of the debt to Trustmark. Both lawsuits and the information contained therein were on file with the Chancery Clerk and were matters of public record. The record establishes, that Bounds' motivation for disclosing the loan information to Stripling was the desire to collect the debt via the consummation of a contract for the sale of water. Therefore, Trustmark has presented a strong argument against the Chancellor's holding.

¶27. Because of the lack of case law in Mississippi regarding the issue involved, this Court is compelled to examine case law from other jurisdictions which are on point and thus persuasive. These decisions establish that confidentiality is owed to a depositor, but the same duty is not extended to a borrower. *Graney Development Corp. v. Taksen*, 400 N.Y.S.2d 717 (Supp. 1978); *Young v. United States Department of Justice*, 882 F. 2d 633 (2d Cir. 1989); *Schonweis v. Dando*, 435 N.W.2d 666 (Neb. 1989). In distinguishing a case of a bank-depositor relationship from a bank-borrower relationship, the New York court held:

> In this case, however, the information revealed by the bank did not concern the plaintiff's deposit with the bank; it concerned a loan made by the bank. As to that loan, the relation between the bank and the plaintiff was solely that of creditor and debtor. The information the bank imparted about the state of the plaintiff's loan was not information it received in its capacity as agent for a depositor; it was information it obtained as a party to the loan

agreement. It was not information that the borrower would normally expect would be kept confidential. One who defaults on his debts owed to a merchant cannot expect that his default will be kept a secret. While a creditor, who publishes his debtors defaults to the public at large may be liable for breach of privacy, he will not be liable (in the absence of malice) if he divulges the default not to the public at large, but privately to selected individuals. The bank in its capacity as lender is in no different position than that of any other lender or creditor. I see no basis, therefore, for implying an agreement of confidentiality to the relations of a bank with its borrowers. The cause of action based upon a breach of implied contract of confidentiality is, therefore, dismissed.

*Graney Development Corp. v. Taksen*, 400 N.Y.S.2d 717, 720 (Supp. 1978).

¶28. In the case *sub judice,* Trustmark , is a party to the loan agreement, not an agent for a depositor. We find that the information relayed to Stripling was not that which would ordinarily be kept confidential. Moreover, the same information was a matter of public record. The bank never published this information, but rather, selectively gave it to a potential buyer, Stripling, whom the bank first learned about from the Hammons. We find nothing out of the ordinary in attempting to locate potential bidders at foreclosure, for it is much better than the situation where the bank is the only bidder present on the courthouse steps. The Chancellor erred in holding that a duty was breached, and that the duty of confidentiality exists between a bank-borrower. In the absence of such a duty, there can be no breach.

## C. Interference with Business Relationship

¶29. The elements for the tort of interference with business relationship are: (1) the act was intentional and willful; (2) that they were calculated to cause damage to the claimants in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss without right or justifiable cause; and (4) that actual damage and loss resulted. *Irby v. Citizens National Bank of Meridian*, 121 So. 2d 118 (Miss. 1960).

¶30. The Hammons argue that May 1990 conversation between Bounds and the contact of Stripling by Mr. Hux, the loan officer, in the Fall of 1991, to attend the foreclosure sale constitute interference with a business relationship. There is no dispute that the bank officers' actions were intentional. However, there is considerable doubt as to whether they were intended to cause damage or loss to the plaintiff, and whether loss or damage actually occurred.

¶31. Bounds' statements to Stripling, disclosed the existence of the Hammons' debts and amount of those debts. At the time of the statements the Hammons were in default on one note, and therefore, the debts were a matter of public record. Although Stripling may have made an offer of five cents per gallon, the record indicates that the Hammons never accepted that offer. Moreover, the record indicates that a contract between Stripling and the Hammons never transpired, not because of Bounds' statements, but because the last offer made to the Hammons was conditioned upon all shareholders selling-- a condition that the Hammons could not fulfill due to Allain and King's 49% ownership of the Hopewell stock. Bounds testified that he disclosed the amounts of the debt in an effort to help Stripling make an offer on the water, thus enabling the Hammons to have sufficient funds with which to pay their debt note. The record simply does not establish that the actions of Trustmark officers were calculated to cause malice.

¶32. In regards to Hux's contact with Stripling, the record indicates that such a maneuver was done to promote the foreclosure. It appears that Bounds and Hux's made their statements in order to recover the money owed to the bank. We again find nothing out of the ordinary and normal course of doing business here. This Court has stated:

> It is equally well established that the interference complained of must be wrongful in order to be actionable and that any interference is not wrongful and actionable if undertaken by someone in the exercise of legitimate interest or right, which constitutes "privileged interference." . . . The general rule in this state is that there is no tortious interference when one has a justifiable interest and reason for acting.

*Vestal v. Oden*, 500 So. 2d 954, 956 (Miss. 1986) (citations omitted).

¶33. Because this case involves a default, and the bank's conduct was justifiable when considering that it was concerned with getting paid on the note, we find that the bank enjoyed a privileged interference. If anything, the interference by the bank aided the Hammons by locating bidders for the foreclosure sale. *See Federal Land Bank v. Collom*, 28 So. 2d 126 (Miss. 1946) (banks are to refrain from action which might deter bidders or suppress offers at a foreclosure). Here, there was clearly a justifiable interest and reason the actions of Trustmark officers. *Vestal,* 500 So. 2d at 956. Having failed to establish the tort of interference in business relationships, the Chancellor was not in error in finding that there was no interference with business relationships.

### D. Oral Loan Agreement

¶34. The Hammons next argue that Trustmark made an oral loan by representing to them that the indebtedness could be paid over a period of several years, if the valuation of the well was as much or more than the indebtedness owed to the bank and that such note would be affordable to them. The Chancellor's opinion found no breach of contract to make an installment loan, mainly because no contract existed where the parties intended to continue negotiating but had not yet reached a mutual agreement. *J. Russell Flower, Inc. v. Itel Corp*., 495 F. Supp. 88 (N.D.Miss. 1980). We agree.

¶35. In the case at bar, the Hammons did not establish the terms of the alleged loan, i.e., the terms of the repayment, the interest rate, and other essentials needed to form a contract. In other words, the appellants have failed to prove that there was a meeting of the minds. We hold that there was no contract and hence no error by the Chancellor.

### E. Refusal to Furnish the Schmitz Report

¶36. The Chancellor, found that under *Mitchell,* the bank's failure to disclose the Schmitz report violated the duty of fairness which requires a mortgagee to furnish the mortgagor with a copy of the appraisal when it is requested. Trustmark argues that the Schmitz evaluation is simply a report on the geothermal activities of the well, and that the monetary value established by that report is worthless and does not constitute an appraisal. Furthermore, the bank contends that *Mitchell* addressed the issue of fraud, which is not asserted in this case. In essence, the bank argues that it does not have to reveal the contents of the Schmitz evaluation, as its purpose for procuring that document was not to seek an unfair advantage over the Hammons, as FANB had attempted to do in *Mitchell*.

¶37. At first glance, **Mitchell** may appear to be analogous to the case at bar. There, the Court held that where the mortgagee advised the mortgagors to sell land under threat of foreclosure, the mortgagee owed a duty to mortgagors to disclose a higher price available for the farm. Even though the relationship of the mortgagors to the mortgagee was adverse in regard to the payment of debt, the mortgagee was under duty to disclose facts peculiarly within its knowledge, such a higher available price for the sale of the mortgagor's real property. 359 So. 2d at 1379-80. After all, "banks are seeking people's trust and confidence and therefore may owe clients a high degree of care." **Id.** at 1380.

¶38. A broad reading of this duty would result in a breach by Trustmark due to the refusal to provide the Schmitz report to the Hammons. Although Trustmark appears to be making a highly technical argument in contending the evaluation was simply a report and not an appraisal, the record reveals that the Chancellor did in fact find that the Schmitz report was deficient in approximating the value of the well, as it did not include the costs of production and other measures usually taken into account when valuing a well.

¶39. It is thus apparent that **Mitchell** does not apply to facts at bar. In **Mitchell**, the facts indicate that there was a "threat of foreclosure." Here, the foreclosure proceedings were triggered by the Hammons' default. Thus, we find that **Mitchell** does not apply, and as a result, there is no duty of disclosure owed by the bank to the Hammons. In addition, the bank's "evaluation/ report/ appraisal" is the property of the bank, as there is no indication that the bank knew of a "better price," and the Hammons were in substantial default at the time of the evaluation. We hold that there is no violation of "fairness" by Trustmark. Accordingly, there is no merit to this issue.

### F. Damages

¶40. The Chancellor found no actual damages, but rather awarded $100 nominal damages. However, the Chancellor then awarded $25,000 punitive damages. Essentially, the lower court found that the Hammons were entitled to monetary vindication for an invasion which produced no loss. The trial court found that the bank wrongfully disclosed the Hammons' debts to Stripling, violating a duty of confidentiality, and further, by failing to furnish the Schmitz evaluation, violated a duty of fairness. However, because the Hammons suffered no actual damages the trial court awarded nominal damages. In addition, the Chancellor awarded $25,000 in punitive damages to prevent this type of conduct in the future.

¶41. However, having held that the bank did not owe an absolute duty of confidentiality in a bank-borrower type relationship; and that the bank did not wrongfully withhold the Schmitz evaluation; we find that having a copy of the evaluation would not have provided the Hammons with any kind of competitive edge.

¶42. Punitive damages are generally awarded for heightened torts which are the product of gross, callous, or wanton conduct, often accompanied by fraud and deceit. **State Farm Fire and Casualty Co. v. Simpson**, 477 So. 2d 242 (Miss. 1985). That kind of conduct has simply not been proven in this case. Moreover, Mississippi law is clear that punitive damages are not recoverable absent an award of actual damages. **Allen v. Ritter**, 235 So. 2d 253 (Miss. 1970); **Miss. Power Co. v. Jones**, 369 So. 2d 1381 (Miss. 1979); **Defenbaugh and Co. v. Rogers**, 543 So. 2d 1164 (Miss. 1989). The Chancellor readily admits that this is the rule. Nonetheless, as he put it, he "see[s] no logic in a rule

that allows punitive damages where actual damages are small, but would not allow punitive damages where actual damages are denied and nominal damages are allowed."

¶43. Thus, even if we were to agree with the Chancellor that there were nominal damages, we must reverse the award of punitive damages, as it is clearly contrary to our well-established case law. The Chancellor was clearly in error in awarding nominal damages as there was no basis to support such an award.

## *CONCLUSION*

¶44. The Chancellor was correct in finding that there is no fiduciary duty, as a matter of law, between the bank and borrower, that there was no interference with business relationship by the bank, and that an oral loan agreement did not exist between the bank and the Hammons. However, the Chancellor erred in finding that a duty of confidentiality existed in a bank-borrower relationship; that there was breach of this confidentiality duty; and that the bank was wrong in refusing to turn over the Schmitz evaluation. The Chancellor correctly found no actual damages existed. The Chancellor erred in awarding nominal damages as well as punitive damages. The Chancellor was correct in awarding judgment to Trustmark on the note with attorneys fees and costs of court. The Court takes note that the Hammons, with assistance of a person other than those allegedly contacted by Trustmark, have paid the debt in full thus satisfying the lien.

¶45. **AFFIRMED IN PART, REVERSED AND RENDERED IN PART.**

**SULLIVAN, P.J., PITTMAN, BANKS, McRAE, ROBERTS AND MILLS, JJ., CONCUR. LEE, C.J., AND PRATHER, P.J., NOT PARTICIPATING.**