# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-CT-01217-SCT

*MIC LIFE INSURANCE COMPANY AND GENERAL MOTORS ACCEPTANCE CORPORATION*

*v.*

*BETTYE HICKS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF DAVID E. HICKS, DECEASED*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 06/19/1998 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JESS H. DICKINSON |
| | KATHARINE MALLEY SAMSON |
| | ANDREW L. FREY |
| | R. WEB HEIDELBERG |
| | JAMES GARFUS THORNTON |
| ATTORNEYS FOR APPELLEES: | A. REGNAL BLACKLEDGE |
| | JOHN M. DEAKLE |
| | JOHN MICHAEL SIMS |
| | WILLIAM R. COUCH |
| | PAUL BRYANT CASTON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 07/25/2002 |
| MOTION FOR REHEARING FILED: | 8/8/2002; denied 9/19/2002 |
| MANDATE ISSUED: | 9/26/2002 |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is granted. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2. Bettye Hicks (Hicks) filed suit against MIC Life Insurance Corporation (MIC Life) and General Motors

Acceptance Corporation (GMAC) in Jones County Circuit Court for failure to timely refund an unaccrued credit life insurance premium. At the conclusion of a trial, the judge directed a verdict against both MIC Life and GMAC for the unrefunded premium as actual damages. The jury then awarded a total of $36 million in punitive damages ($30 million against GMAC and $6 million against MIC Life). Upon motion, the trial court remitted the awards to $5 million and $1 million respectively. GMAC and MIC Life filed a timely appeal, and the Court of Appeals heard the matter.

¶3. On appeal, the Court of Appeals found that a jury issue existed regarding the liability of GMAC for the unrefunded insurance premium and thus, that a directed verdict was inappropriate. This, in turn, brought the propriety of the punitive damage award against GMAC into question. In addition, the Court of Appeals found the punitive damage award against MIC Life should be reversed as a result of prejudicial trial errors, but affirmed the compensatory damage award as to MIC Life. Each of the parties filed a Petition for Writ of Certiorari, and we granted each of them.

## FACTS

¶4. In 1991, David Hicks bought a Chevrolet pickup truck from Hankins Chevrolet in Taylorsville, Mississippi, and financed the purchase. Hankins actually financed the truck for Hicks, but immediately sold the installment contract to GMAC. When purchasing the vehicle, Hicks also chose to obtain credit life insurance. GMAC advanced the entire premium of $1,044.48, and added that amount to the principal of the installment contract. MIC Life received half the premium, and Hankins was paid the other half as a commission for selling the policy. MIC Life placed its funds in a premium reserve, paying itself from the reserve over the term of the loan as each premium was earned. Of note, MIC Life is a solely owned subsidiary of Motor Insurance Corporation, which in turn is solely owned by GMAC. Motors Insurance Corporation was not a party to this suit.

¶5. Approximately one year after the purchase, Mr. Hicks traded the 1991 truck for a smaller 1992 model at Chris Posey Chevrolet in Laurel, Mississippi. At this time, the installment loan was satisfied. As a result of the loan being paid off early, MIC Life was now holding unearned premiums in the amount of $637.99 which rightfully belonged to Hicks. Under GMAC's standard procedure in Mississippi, GMAC returned the canceled note to Hicks and also notified the original dealer, Hankins, that the note had been satisfied. Attached to the canceled contract was a form notice that stated, "we suggest that you contact the dealer or the insurance company regarding a possible rebate of the creditor life and/or disability insurance premium." This type of notice is referred to as an "OLA notice." Hicks did not read the notice, but simply filed it away.

¶6. On February 24, 1995, Hicks died. While going through papers in order to properly administer the estate, Mrs. Hicks found the notice and read it. She immediately obtained a claim form from Hankins and submitted it to MIC Life. In a letter dated April 10, 1995, MIC Life denied the claim because the policy did not cover the new truck. MIC Life did inform Mrs. Hicks that she was entitled to $637.99 in unearned premiums. However, Mrs. Hicks did not receive the refund until October 1995 after the lawsuit was filed. MIC Life would later assert at trial that there had been a "clerical error" in processing her refund.

¶7. On July 5, 1995, Mrs. Hicks filed suit against GMAC and MIC Life. She alleged unjust enrichment, negligence, and breach of fiduciary duty against GMAC and breach of contract, breach of fiduciary duty, unjust enrichment, breach of the duty of good faith and fair dealing and negligence against MIC Life. At the close of Hicks's case in chief, neither GMAC nor MIC Life chose to put on any evidence. The trial court then entered a directed verdict finding both defendants "jointly and severally liable to the plaintiff for

compensatory damages as to all counts" in the complaint. The trial court rendered actual damages in the amount of the unrefunded premium ($637.99) against both GMAC and MIC Life. The trial court then submitted the issue of punitive damages to the jury. Over defense objection, Hicks's attorney stated in closing argument that another jury had awarded punitive damages of $38 million "not long ago" in another case. The jury returned a verdict for punitive damages in the amounts of $30 million against GMAC and $6 million against MIC Life. The trial court remitted the awards to $5 million and $1 million respectively. GMAC and MIC Life appealed, and the matter was heard by the Court of Appeals.

¶8. On appeal, the COA majority found there was insufficient evidence to support a directed verdict against GMAC as to the actual damages, and the issue should have been left to the jury. This brings the propriety of the punitive damage award against GMAC into question. There was no problem concerning the actual damage award as to MIC Life. However, the Court of Appeals found that prejudicial trial errors were committed when the trial court allowed the jury to hear evidence concerning GMAC's procedures in other states, allowed improper lay testimony drawing legal conclusions, and commented on the credibility of a witness. The Court of Appeals also found that Hicks's counsel made prejudicial statements during closing arguments and rebuttal. As such, the court reversed and remanded as to the punitive damages. The dissent opined that the errors were only prejudicial to GMAC; and therefore, the errors were harmless as to MIC Life. A petition for writ of certiorari was subsequently filed by each party. We granted all three petitions and now consider the matter.

## DISCUSSION

### I. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DIRECTING A VERDICT AGAINST GMAC FOR THE UNEARNED PREMIUMS AND THUS, WHETHER PUNITIVE DAMAGES WERE WARRANTED.

¶9. The Court of Appeals found that the trial court committed reversible error in directing a verdict against GMAC for the unearned premiums but also found that enough evidence existed to create a jury question. As such, the Court of Appeals reversed the directed verdict and remanded the issue for consideration by the jury. We agree.

¶10. In order for GMAC to be liable for punitive damages, it must first be liable for actual damages. *Hopewell Enters., Inc. v. Trustmark Nat'l Bank*, 680 So. 2d 812, 820 (Miss. 1996). Since GMAC's possible liability is not born in contract or statute, it is a fact question to be resolved by a jury based on the introduced evidence of a conspiracy. In support of this theory, Hicks alleged that through the use of an ineffective notification system, GMAC and MIC Life conspired to retain a percentage of unearned insurance premiums. There is little doubt that the OLA notice system was not the most effective way of refunding unearned premiums. Furthermore, the use of such a system raises suspicions that the motive for its adoption was to reduce the number of refunds given by reducing the number of requests. As the Court of Appeals found, if that indeed was the purpose of employing OLA system, then a jury question arises as to whether GMAC breached other obligations owed to Hicks, such as good faith and fair dealing.

¶11. A thorough review of the record clearly shows that while there was certainly evidence of a conspiracy between GMAC and MIC Life, it was not of such a nature as to take it out of the province of the jury. A directed verdict should not be granted if there is "evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions." *Munford, Inc. v. Fleming*, 597 So. 2d 1282, 1283 (Miss. 1992) (citing *Litton Sys., Inc. v. Enochs*, 449 So. 2d

1213 (Miss. 1984)). The evidence in this case was such that reasonable jurors might have reached different conclusions; and therefore, a directed verdict was inappropriate. The Court of Appeals is affirmed on this issue.

## II. WHETHER THE COURT OF APPEALS PROPERLY REVERSED THE PUNITIVE DAMAGE AWARD AGAINST MIC Life.

### 1) MIC Life's liability

¶12. MIC Life does not dispute that it owes the $637.99 in unearned premiums, so that is not an issue. What is at issue is whether MIC Life violated Miss. Code Ann. § 83-53-17 (1999), the violation of which was the basis for awarding punitive damages. In order to determine whether a violation occurred, the proper meaning of Miss. Code Ann. § 83-53-17 (1999) must be understood. When interpreting a statute, we must first examine the language of the statute in question. "The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein. Where the statute is plain and unambiguous there is no room for construction . . ." ***Clark v. State ex rel. Miss. State Med. Ass'n***, 381 So. 2d 1046, 1048 (Miss. 1980). Pursuant to the rule, we therefore must examine the language of Miss. Code Ann. § 83-53-17(2) (1999), which provides in pertinent part:

> Each individual policy or group certificate shall provide that in the event of termination of the insurance prior to the scheduled maturity date of the indebtedness, any refund of an amount paid by the debtor for insurance shall be paid or credited promptly by the insurer to the person entitled therefor; . . . **The insurer shall pay or cause to be paid to the debtor any refund due pursuant to this subsection within thirty (30) days of the accrual of such refund.**

(emphasis added).

¶13. The Court of Appeals majority read into this statute a requirement that the insured notify the insurer, and thus, MIC Life was delinquent in refunding the money by a mere few months which can be explained away due to a "clerical error." In contrast, we agree with the dissent. The statute is clear and unambiguous, and it does not contain a notice requirement. It would have been a simple matter for the Legislature to include a notice provision in the statute had it intended one. MIC Life, as the insurer, was thus bound by statute to refund the unearned premiums within 30 days of termination of the policy, which occurred in 1992. A notice requirement should not be read into the statute, and the Court of Appeals is reversed on this issue.

¶14. Furthermore, as the Court of Appeals dissent points out, the insurance contract also contained no requirement that the insured notify the insurer of termination. "In the event of termination of this insurance prior to the maturity date, the unearned portion of the insurance charge will be refunded to you or credited toward your indebtedness."

¶15. As deftly phrased by Judge Irving's opinion, "[f]aced with a statutory duty to refund unearned premiums within thirty (30) days, it was incumbent upon MIC Life to have controls in place to guarantee compliance with its statutory duty." Since the loan was paid off on June 29, 1992, MIC Life had until July 29, 1992, to refund the unearned premium. Under the Court of Appeals holding, MIC Life tried to excuse its tardiness by blaming the delay on a "clerical error." However, under the proper interpretation, MIC Life was already over two years delinquent when the "clerical error" occurred. This is ample evidence to support

the imposition of punitive damages, and as the dissent below stated, "it is entirely reasonable for the jury to conclude that MIC Life's failure to make the refund until October 1995, represented gross indifference to Hicks's rights."

¶16. In rebuttal, MIC Life suggests that a statute of limitations problem arises. It contends, and the Court of Appeals agreed, that our interpretation would require that suit be brought by June 29, 1995 (three years from the date the note was paid off). Hicks's cause of action did not accrue until there had been an actual denial of her claim for a refund, or until the thirty day time limit to pay pursuant to Miss. Code Ann. § 83-53-17(2) (1991) had lapsed. In the present case, MIC Life never notified Hicks of the denial of her claim, and thus her cause of action did not accrue until July 30, 1992. Since there is a three-year statute of limitations and the complaint was filed on July 5, 1995, the suit was timely. Thus, the matter was not barred by the statute of limitations and we affirm, but for different reasons.

¶17. While we find that punitive damages are warranted by MIC Life's conduct, we find that the $1 million in punitive damages awarded below is grossly excessive. We review de novo a challenge to the constitutionality of the size of a punitive damages award. See *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 1683, 149 L.Ed.2d 674 (2001). The imposition of punitive damages under state law is constrained by the Eighth and Fourteenth Amendments, the first proscribing excessive fines and cruel and unusual punishment, the second making grossly excessive punishments unlawful under its Due Process Clause. *See id.* at 1684. In *BMW of N. Am., Inc. v. Gore*, the Supreme Court articulated three factors that courts should consider in determining whether an award of punitive damages is constitutionally excessive. Those three factors are: (1) the reprehensibility of the conduct; (2) the ratio of compensatory damages awarded to punitive damages; and (3) a comparison of the punitive damages award with any possible civil or criminal sanction. *Gore*, 517 U.S. at 580.

¶18. The first factor has been discussed above with a finding that the conduct does warrant some punitive award. The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award, as stated in *Gore*, is its ratio to the actual harm inflicted on the plaintiff -- that is, the ratio of compensatory damages to the punitive damages awarded. *Gore*, 517 U.S. at 580. "The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree." *Id.* (citations omitted). This determination may include consideration of the relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred. *Id.* at 581 (citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21, 111 S.Ct. 1032 1045, 113 L.Ed.2d 1 (1991)). It must be noted that this factor is a consideration of the harm *to the victim* that would have ensued had the tortious conduct succeeded or continued. *Gore*, 517 U.S. at 581 (citing *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993)).

¶19. The ratio of compensatory damages to punitive damages in *Gore* was 500:1. *Gore,* 517 U.S. at 583. The Supreme Court termed this ratio "breathtaking" and stated that such a disparate award must surely "raise a suspicious judicial eyebrow." *Id.* The ratio in the present case is **1567:1**. If that awarded in *Gore* was breathtaking, the amount awarded below absolutely boggles the mind. Though the Court in *Gore* recognized that there is no mathematical bright line, we find that the amount awarded here is absolutely beyond excessive.

¶20. In *Independent Life & Acc. Ins. Co. v. Peavy*, 528 So. 2d 1112 (Miss.1988), this Court upheld a

punitive damages award approximately **600 times** that of the compensatory damages. This is the highest ratio sanctioned by this Court. In ***Dixie Ins. Co. v. Mooneyhan***, 684 So. 2d 574, 587 (Miss. 1996), this Court found the punitive damages award, which was **1,875 times** the actual damage, to be excessive.

¶21. Under the third guidepost, ***Gore*** mandates that we compare the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. ***Gore***, 517 U.S. at 583. Miss. Code Ann. § 83-5-17 (1999) provides a maximum penalty of $5,000 for each offense committed by MIC Life. The maximum penalty that could be awarded against MIC Life for its proven conduct in the case at bar is $5,000. A reviewing court engaged in determining whether an award of punitive damages is excessive should "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue" as the sanctions imposed by the legislature are duly considered by the courts to be those the legislature has determined to be necessary to achieve the goal of deterring future misconduct. ***Gore***, 517 U.S. at 583-84. The sanction imposed in the case sub judice cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal.

¶22. The constitutional question presented is whether MIC Life had fair notice that it could be punished $1 million for failing to pay a refund of $637.99 to Mrs. Hicks, not some "potential," hypothetical aggregate of harm to persons not before this Court and against whom no harm has been proven. We find that MIC Life did not have fair notice of such a punishment. A correct analysis of the ***Gore*** factors reveals that the punitive damages award in this case is unconstitutionally excessive.

### 2) Alleged Prejudicial Trial Errors

¶23. Finally, the Court of Appeals held that there were prejudicial errors committed by the trial court when the jury was allowed to hear evidence concerning GMAC's procedures in other states, allowed improper lay testimony drawing legal conclusions, commented on the credibility of a witness, and failed to take corrective action when Hicks's counsel made prejudicial statements during closing arguments. In defense, Hicks argues that it was not error to admit evidence of statutes in eight other states which require automatic refunds of unearned premiums on credit life policies because the purpose was to show that MIC Life and GMAC had knowledge that an automatic refund system was practical and could have been followed in Mississippi. Furthermore, Hicks asserts that the other alleged errors, when taken in the context of the trial as a whole, did not have any prejudicial effect. We agree with the Court of Appeals that these errors clearly require reversal of the punitive damages award against MIC Life.

### A. Statutes of Other States

¶24. The first allegation of error concerns evidence of procedures in other states that impose a duty upon lenders, like GMAC, to make refunds of unearned premiums. Hicks referred to a GMAC manual that informed its dealers that in eight states it was necessary for the creditor to refund unearned premiums on credit life policies. The argument for the relevance of this evidence is that the defendants were aware that requiring the borrower/insured to request a refund was not as effective as the system in these other eight states. Hicks argued at trial that the system in place was ineffective in refunding unearned premiums. This argument necessarily implicates MIC Life as well as GMAC because MIC Life was the party holding the unearned premium and the one obligated under our statute to return the premium. Though the statutes of the other states require the creditor (GMAC) to refund the premium, they were offered to show that both defendants were aware that requiring the insured to request the refund was not as effective as the

procedures utilized in other states. Hicks sought to impose a duty on both GMAC and MIC Life, not just GMAC, to return the premiums.

¶25. The evidence of other statutes was offered to suggest there were methods by which both companies voluntarily could have applied a direct reimbursement approach in Mississippi. We agree with the Court of Appeals that it was error to allow this testimony in that it is much more likely to mislead a jury than to assist.

## B. Testimony of GMAC Employee

¶26. The second allegation of error is in regard to questions posed to Mildred Wilbanks, a GMAC employee, asking her to interpret the insurance contract between Hicks and MIC Life and the OLA scheme. Wilbanks is not an attorney and is not qualified to testify as to legal conclusions. Thus, we find that this line of questioning was improper and prejudiced both GMAC and MIC Life.

¶27. It is clear that the questions were meant to establish knowledge and role in a conspiracy on the part of GMAC. It is clear from the record that a central allegation at trial was the conspiracy theory. As Court of Appeals Judge Irving stated in his dissent, the allegations of conspiracy were the "bedrock" of Hicks's action, though the complaint did not allege an outright conspiracy between MIC Life and GMAC. The parties understood this to be the case, and the case was tried accordingly. GMAC and MIC Life were tied together by more than just the allegations of conspiracy. GMAC is the corporate grandparent of MIC Life, GMAC financed the premium for the life insurance, and the evidence at trial showed that though the two are separate entities, there was much interplay between the two.

## C. Judge's Comments on the Credibility of a Witness

¶28. The witness, a MIC Life employee, stated he was not qualified to comment on the refund procedures set out by the statutes of other states and that he was unable to comment on the motivation behind GMAC, another company not his employer, in lending money for life insurance. The trial judge, more than once, chastised the witness for, what he determined was, "equivocating." He instructed the witness to "be candid." He told defense counsel that "you people need to tell your witness how to testify." First, these statements were improper and amount to reversible error. Second, whether the witness was evasive was a question of credibility properly for the jury, and instructing a witness to "be candid" is tantamount to informing the jury that the witness is being deceitful and evasive. The trial judge clearly invaded the province of the jury. Moreover, a judge's comments carry great weight with a jury which was not likely to forget such egregious comments by this trial judge. Though the witness was asked to testify to matters regarding GMAC, he was an employee of MIC Life.

## D. Prejudicial Statements by Plaintiff's Counsel

¶29. Hicks's counsel told the jury about a $38 million verdict "up here not long ago." The jury returned a verdict of $36 million. These comments were improper, and it cannot be said that they had no effect on the jury when one considers the similarity between the actual verdict and the one mentioned by Plaintiff's counsel.

¶30. We find that these errors clearly require reversal. The trial was sufficiently flawed as to draw into question the verdict against both defendants. Those errors that did not prejudice MIC Life directly prejudiced MIC Life indirectly as the alleged co-conspirator of its co-defendant.

## CONCLUSION

¶31. The trial court entered directed verdicts against both GMAC and MIC Life, and the jury awarded Hicks punitive damages in the amount of $36 million which was remitted to $6 million. On appeal, the Court of Appeals reversed the trial court on all questions except the award of compensatory damages against MIC Life. We reverse and remand the case as to GMAC to the Jones County Circuit Court for a new trial in harmony with this opinion. We reverse and remand for a new trial on the amount of punitive damages awarded against MIC Life. MIC Life did not appeal the directed verdict and award of actual damages against it, and thus they stand.

¶32. **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**PITTMAN, C.J., WALLER, COBB AND CARLSON, JJ., CONCUR. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., AND GRAVES, J. EASLEY, J., JOINS IN PART.**

**DIAZ, JUSTICE, DISSENTING:**

¶33. Because I disagree with the majority's findings that the punitive damages award is unconstitutionally excessive and that certain errors at trial warrant reversal, I respectfully dissent.

¶34. There is no "hard and fast" rule for determining whether a punitive damage award is excessive. Several factors must be considered: (1) the award should punish the insurer and deter it from committing similar offenses in the future; (2) the award should serve as an example to deter others from committing similar offenses; (3) the award should account for the insurer's financial worth; and (4) the amount should compensate the plaintiff for his or her public service in bringing the action. *Dixie Ins. Co. v. Mooneyhan*, 684 So.2d 574, 585-86 (Miss. 1996)(collecting authorities). A punitive damages award will only be disturbed where it is so excessive that it "evinces passion, bias, and prejudice on the part of the jury so as to shock the conscience of the Court." *Id.*

¶35. Soon after *Mooneyhan*, the United States Supreme Court decided *BMW of North Am., Inc. v. Gore*, 517 U.S.559, 134 L.Ed. 2d 809, 116 S.Ct 1589 (1996). Two years after the *Gore* decision, this Court again had the opportunity to consider the propriety of a punitive damages award in *State Farm Mut. Auto. Ins. Co. v. Grimes*, 722 So.2d 637 (Miss. 1998). In *Grimes*, we held that our scheme for reviewing punitive damages, found in *Mooneyhan,* is still constitutional, even in light of *Gore*. *Grimes*, 722 So.2d at 642. As such, I would analyze the case at bar using the tests found in both *Gore* and *Mooneyhan*.

¶36. As stated by the majority, *Gore* listed several factors courts should weigh when determining whether a punitive damages award is excessive. First, the degree of reprehensibility should be considered. As previously stated, MIC's actions reflect a gross indifference to Hicks's rights. As such, I would find that MIC's behavior was reprehensible. Second, *Gore* requires us to analyze the ratio of compensatory damages awarded to the punitive damages awarded. 517 U.S. at 580. *Gore* found that a ratio of five hundred to one "raised a suspicious judicial eyebrow." *Id.* at 583. However, the Court did not hold this ratio to be a cut-off point for all cases. In fact, *Gore* held that there is no "mathematical bright line" drawn between awards which are constitutional and awards which are unconstitutional. *Id*. The third factor in

*Gore* requires a comparison of the punitive damage award with any possible civil or criminal sanction which could be placed on the defendant. Miss. Code Ann. § 83-5-17 provides a maximum penalty of five thousand dollars for each offense committed by MIC

¶37. While the majority finds these last two factors to be decisive in this case, I believe the last two factors must be considered in light of our stated purpose for allowing punitive damages in this state: punishment and determent. As previously stated, MIC was under a statutory duty to refund unearned premiums within thirty days and, clearly, MIC engaged in a pattern of conduct which did not discharge this duty. While I realize that punitive damages cannot specifically punish a defendant for damage that defendant inflicted on non-parties, I believe we must keep in mind our goal of punishing conduct which had the potential to cause great harm to many people and discouraging others from committing similar offenses. In cases such as this, the individual plaintiff's monetary damages will rarely be significant enough to be the basis for a punitive damages award that would realistically serve to punish the defendant or deter others from engaging in the same conduct. Therefore, I would find that the punitive damages award in this case is not excessive.

¶38. The majority also finds that there were prejudicial errors committed by the trial court requiring reversal. I would again agree with the Court of Appeals dissent that these errors, for the most part, affected GMAC and were harmless as to MIC.

¶39. The majority finds that the trial court erred by allowing in evidence of other states' procedures that impose a duty upon lenders to make refunds of unearned premiums. As already discussed, MIC has a statutory duty to make prompt refunds. Therefore, admission of evidence that does not even concern insurers, but creditors, cannot prejudice MIC and cannot be a basis for reversal.

¶40. The majority also finds that questions posed to GMAC employee Mildred Wilbanks were meant to establish a GMAC's role in a conspiracy with MIC. A review of the record does not conclusively establish that the questions asked were so improper as to demand reversal. Furthermore, the questions were meant to establish knowledge and a role in a conspiracy on the part of GMAC. The searched for information was to bolster Hicks's claims against GMAC, not MIC. Again, any prejudice from these questions affected GMAC and were relatively harmless to MIC.

¶41. Next, the majority finds that comments made by the trial judge amount to reversible error. A review of the comments reveals that they indeed may border on improper, but they could also have been the result of an evasive witness and a frustrated judge. In any case, they do not appear to be so outlandish as to warrant reversal. In addition, the Court of Appeals dissent pointed out that since MIC is statutorily bound to refund the premiums, the error, if any, would at most affect GMAC who is already receiving a remand.

¶42. Finally, the majority finds that statements made by plaintiff's counsel during closing argument constitute reversible error. I would find that these comment only affected GMAC; in fact, they were specifically about GMAC, not MIC. The comment that GMAC had been "called on the carpet" could be a basis for argument by GMAC, but it remains to be seen how it affected MIC. As for the uncited statement about a $38 million verdict "up here not long ago," it alone does not support reversal. True, the jury's verdict of $36 million is remarkably similar, but if it prejudiced the jury, it did so mainly against GMAC which bore the brunt of the verdict ($30 million). Even further weakening MIC's case is the remittitur to $1 million against it. Considering all things, the reasonable inference of gross indifference on MIC's part more than justifies a $1 million verdict. Thus, there is no evidence of prejudice. Because I would find the errors to be harmless as to MIC, I would affirm the trial court's judgment as to MIC.

**McRAE, P.J., AND GRAVES, J., JOIN THIS OPINION. EASLEY, J., JOINS THIS OPINION IN PART.**