914 So.2d 214 (2005)
PROGRESSIVE CASUALTY INSURANCE Company and Progressive Gulf Insurance Company, Appellants
v.
ALL CARE, INC. d/b/a Jackson Physical Medicine & Rehabilitation, Appellee.
No. 2003-CA-01197-COA.
Court of Appeals of Mississippi.
June 7, 2005.
Rehearing Denied August 23, 2005.
Certiorari Denied November 10, 2005.
*217 W. Wayne Drinkwater, Margaret Oertling Cupples, attorneys for appellants.
William P. Featherston, Linley Jones, attorneys for appellee.
EN BANC.
BRIDGES, P.J., for the Court.

BACKGROUND
¶ 1. All Care, Inc. (All Care) sued Progressive Gulf Insurance Company (Progressive) *218 in Hinds County Circuit Court. All Care sought damages based on the assertion that Progressive engaged in tortious interference with All Care's business relations. Following trial, the jury returned a verdict for All Care and awarded $1,436,000 in actual business losses. Post trial, Progressive filed an unsuccessful motion for judgment notwithstanding the verdict. Progressive appeals the circuit court's denial of its motion for judgment notwithstanding the verdict and asserts the following allegations of error, listed verbatim:
I. WHETHER ALL CARE FAILED TO PROVE THAT PROGRESSIVE DEFENDANTS ACTED WITH A MALICIOUS INTENT TO HARM ALL CARE'S BUSINESS, AND WITHOUT A LEGITIMATE PURPOSE OR JUSTIFIABLE CAUSES.
II. WHETHER ALL CARE FAILED TO PROVE THAT THE PROGRESSIVE DEFENDANTS PROXIMATELY CAUSED QUANTIFIABLE DAMAGES TO ALL CARE.
III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE DAMAGES TESTIMONY OF DR. STAN SMITH TO BE HEARD BY THE JURY.
Finding no error, we affirm.

FACTS
¶ 2. Between July of 1994 and August of 1997, All Care owned and operated a medical clinic in Jackson, Mississippi. All Care treated minor soft tissue injuries, exclusively. The majority of All Care's patients were client referrals from personal injury attorneys. Personal injury attorneys tended to refer their clients to All Care because All Care utilized a "lien billing system."
¶ 3. According to All Care's lien billing system, when a personal injury attorney referred a client to All Care, All Care would provide treatment to that client and would forego payment at that time. If a patient collected on his personal injury claim, All Care was paid from the proceeds. If a patient did not collect on his personal injury claim, the patient was held personally responsible for All Care's medical bills. At the end of 1995, All Care experienced a drop in the number of referrals. As a result, All Care's earnings dropped.
¶ 4. During All Care's existence, Progressive employed an insurance adjuster named Michael Muench. In his role as an adjuster, Muench frequently engaged in conflicts with various personal injury attorneys over the amount and propriety of All Care's medical fees. All Care believed that Muench targeted All Care and waged an inappropriate war of attrition against All Care's reputation and billing practices. All Care felt that Muench ultimately bullied numerous personal injury attorneys into sending their clientele to competing medical clinics. All Care eventually became increasingly unprofitable and blamed Muench and Progressive for its decline in earnings. Accordingly, All Care filed suit against Progressive, from which the present action arises.

ANALYSIS

I. WHETHER ALL CARE FAILED TO PROVE THAT PROGRESSIVE DEFENDANTS ACTED WITH A MALICIOUS INTENT TO HARM ALL CARE'S BUSINESS, AND WITHOUT A LEGITIMATE PURPOSE OR JUSTIFIABLE CAUSES.
¶ 5. Broadly speaking, Progressive asserts that All Care failed to prove the prima facie elements of a claim of tortious interference with business relations. Tortious interference *219 with a business relationship occurs when "a wrongdoer unlawfully diverts prospective customers away from one's business, thereby encouraging customers to trade with another." Cenac v. Murry, 609 So.2d 1257, 1268 (Miss.1992) (internal quotations omitted). To prove a prima facie claim of tortious interference with a business relationship, a plaintiff must prove that:
(1) the acts were intentional and willful;
(2) the acts were calculated to cause damage to a plaintiff in its lawful business;
(3) the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and
(4) actual damage and loss resulted.
MBF Corp. v. Century Bus. Communications, Inc., 663 So.2d 595, 598 (Miss.1995).
¶ 6. In this issue, Progressive asserts that All Care failed to prove that Progressive's actions were calculated to cause All Care to suffer damage and loss. Additionally, Progressive asserts that All Care failed to prove that Muench's actions were without right or justifiable cause. If Progressive is correct in either assertion, this Court must reverse and render judgment for Progressive. Conveniently, we can address both contentions in a single analysis.
¶ 7. Progressive maintains that the jury could not have found malicious intent due to Muench's criticisms of All Care's business practices. Further, Progressive asserts that Muench had a justifiable interest in and reason for scrutinizing All Care's billing and treatment practices. Truly, conduct related to a legitimate, employment-related objective constitutes justifiable acts, which cannot "give rise to an inference of malice." Hopewell Enter., Inc. v. Trustmark, 680 So.2d 812, 818-19 (Miss.1996). Accordingly, tortious interference requires "intermeddling ... without sufficient reason." Morrison v. Mississippi Enter. for Tech., Inc., 798 So.2d 567(¶ 28) (Miss.Ct.App.2001). Progressive claims Muench was fully justified in his comments to personal injury attorneys. According to Progressive, since Muench's comments were justified, Progressive is immune from liability.
¶ 8. Progressive argues that All Care did not present any evidence from which a jury could find that Muench acted in a malicious manner. That is, Progressive argues that Muench's job as an insurance adjuster was to scrutinize All Care's bills for errors and to challenge those errors. Progressive points to testimony from All Care's witnesses that, of the twenty-four All Care claims Muench was associated with, he never failed to settle a single claim for a fair value. Progressive asserts that Muench's actions may have inconvenienced All Care, or cost All Care money, but that does not make Muench's actions unlawful. Hall v. Mid-America Dairymen, Inc., 727 So.2d 776(¶ 12) (Miss. Ct.App.1999); Vestal v. Oden, 500 So.2d 954, 956-57 (Miss.1986).
¶ 9. Muench, an insurance adjuster, no doubt had a justifiable reason for negotiating with personal injury attorneys over All Care's fees. Muench's employer, Progressive, had an obvious reason to encourage Muench to seek lower fees. It requires no speculation to recognize that Progressive would prefer to retain money, rather than pay it to All Care. Progressive would cease to operate if it did not scrutinize claims. However, it is not Muench's scrutiny of treatment fees that is problematic.
¶ 10. The evidence showed Muench made comments well beyond his role as an insurance adjuster. Muench alleged that All Care was under investigation by the state attorney general. All Care was not *220 under investigation by the state attorney general. Muench commented that All Care was under investigation by the state medical licensure board. All Care was not under investigation by the state medical licensure board. Muench told an attorney that All Care illegally practiced physical therapy. All Care did not practice physical therapy at all. Muench mailed an attorney a letter indicating that All Care was unlawfully billing for physical therapy. All Care did not bill for physical therapy. Muench told an attorney that All Care employed physicians that were unqualified to practice medicine. The physicians that All Care employed were all licensed to practice medicine. What was Muench's purpose in advancing these repetitive misstatements? How did Muench advance his employer's interest in stating his unfounded allegations? How did Muench justify his actions in light of his role as an insurance adjuster? Would an allegation that All Care employed unqualified physicians somehow lead to a decreased fee for All Care's services?
¶ 11. The standard attached to Progressive's assertion requires this Court to accept that evidence as true where that evidence supports the verdict. Herrington v. Spell, 692 So.2d 93, 103 (Miss.1997). The verdict suggests that Muench had no justifiable employment-related purpose in communicating allegations that did not serve any purpose connected to his role as an insurance adjuster. Muench could only arrive at his conclusions through some misunderstanding or an unfounded interpretation, as all of the relevant statements were false. It is not beyond the realm of possibility to conclude that Muench completely fabricated his allegations and lied to the attorneys he dealt with. It is clear that the jury could have concluded that Muench's comments were intended to cause All Care to suffer loss. It is equally clear that the jury could have determined that Muench did not have justifiable or legitimate cause to communicate numerous unfounded allegations, completely unrelated to his duties as an insurance adjuster. Because Muench communicated falsehoods to the largest group of All Care's clientele, which caused those clients to take their business elsewhere, the evidence in the light most favorable to the verdict suggests that the circuit court's decision on this issue is correct. Accordingly, we affirm the decision of the circuit court.

II. WHETHER ALL CARE FAILED TO PROVE THAT THE PROGRESSIVE DEFENDANTS PROXIMATELY CAUSED QUANTIFIABLE DAMAGES TO ALL CARE.
¶ 12. Similar to the first issue, Progressive asserts that All Care failed to prove the prima facie elements of a claim of tortious interference with business relations. In this issue, Progressive asserts that All Care failed to prove Muench's actions caused All Care to suffer quantifiable damages. Furthermore, Progressive asserts that even if damages could be inferred from the testimony at trial, there was no "hard" evidence from which the jury could determine the amount of damages incurred. In other words, Progressive argues that the jury's finding of damages is against the overwhelming weight of the evidence. When faced with such an assertion, this Court must accept as true that evidence which supports the verdict and will reverse only when convinced that the circuit court abused its discretion in failing to grant a new trial. Wal-Mart Stores, Inc. v. Frierson, 818 So.2d 1135(¶ 16) (Miss.2002) (citations omitted). Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb the verdict on appeal. Id.
*221 ¶ 13. In order to prove a prima facie case of damages, "the plaintiff must show (1) a loss, and (2) that the defendant's conduct caused the loss." MBF, 663 So.2d at 598 (quoting Cenac, 609 So.2d at 1271). A party will not be able to escape liability because of a lack of a perfect measure for damages. MBF, 663 So.2d at 599. Rather, sufficient proof is that which is a reasonable basis for computation of damages and the best evidence obtainable under the circumstances of the case that will enable the trier of fact to arrive at a fair approximate estimate of the loss. Id.
¶ 14. Regarding Progressive's contention that All Care did not present "hard evidence" to show Muench was responsible for the failure of All Care's entire business, in Cenac, the Mississippi Supreme Court considered a similar contention. Cenac, 609 So.2d at 1257. The Cenac court concluded that the plaintiff therein failed to demonstrate "hard" proof that the defendant therein caused the plaintiff's business to suffer financial ruin. Id. at 1272. The Mississippi Supreme Court noted that the plaintiff in Cenac only presented one witness who testified that he stopped frequenting the subject business because of the defendant. Id. Additionally, the plaintiff in Cenac attempted to put forth evidence that demonstrated a list of customers who stopped patronizing the subject business due to the defendant's acts. Id. That evidence was never admitted, so the jury could not consider it. Id. However, the Cenac court recommended the means to arrive at "hard" proof of damages. That court suggested that "hard" proof of damages could be accomplished by illustrating and comparing the volume of business and profits before and after the alleged malicious acts. Id. So, the question is whether All Care submitted hard proof of damages by illustrating and comparing the volume of All Care's business and profits before and after Muench's acts.
¶ 15. In the case at bar, All Care presented documentary evidence that the number of its clients dropped significantly after the fourth quarter of 1995. All Care also demonstrated that the amount of charges that All Care billed to patients decreased. Consequently, All Care's profitability dropped. All Care submitted quarterly billing summaries, payment summaries, and referral summaries in its effort to prove damages. The billing and payment summaries showed a decrease in All Care's patient inventory and receivables between 1995 and 1997. Accordingly, All Care succeeded in demonstrating "hard" proof of damages, as discussed in Cenac.
¶ 16. "Hard" proof of damages notwithstanding, All Care directs this Court's attention to Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc., 725 So.2d 902(¶ 36) (Miss.1998) to suggest that the financial statements in evidence at trial, along with the testimony at trial suffices as an adequate demonstration of causation and damages. In Fred's Stores, a former employee of Super D pharmacy took a list of pharmacy customers and their spending histories when the employee took a position at a pharmacy in Fred's. Id at (¶ 2). That employee sent targeted mailings to Super D's customers in an effort to induce Super D's customer to switch to Fred's. Id. At trial, Super D submitted a list of one hundred-fifty customers who switched from Super D to Fred's, as well as a tabulation of how much money those customers spent at Fred's. Id. at (¶ 37). On appeal, Fred's argued that customers on the list should have testified that they chose to shop at Fred's instead of Super D because of the letters sent by the former employee. Id. at (¶ 34). Fred's argued that the customers' failure to testify as *222 such amounted to insufficient proof of proximate cause. Id. The Mississippi Supreme Court held that no testimony from the past customers was required, as the customer list in evidence consisted of "hard proof" of the business's financial losses. Id. at (¶ 37).
¶ 17. In Fred's Stores, the customer list illustrated which customers ceased to use Super D in favor of Fred's, and the exact amount of business lost from each customer, thus sufficing as "hard proof" in the eyes of the Court. Id. Here, All Care submitted exhibits that indicated that the number of clients visiting All Care decreased significantly after the fourth quarter of 1995. Those exhibits also indicated that the amount All Care billed, and ultimately All Care's profitability dropped in direct relation to the decrease in clients over that time period. Clearly, All Care demonstrated loss of income. The jury had evidence to compare the volume of business and profits before and after Muench's acts, which was sufficient to show malicious intent.
¶ 18. As mentioned, in order to prove a prima facie case of damages, "the plaintiff must show (1) a loss, and (2) that the defendant's conduct caused the loss." MBF, 663 So.2d at 599 (quoting Cenac, 609 So.2d at 1271). This Court has resolved the first "prong" of MBF. We now turn our attention to the second "prong" and resolve whether All Care presented evidence that Muench was the cause of those losses.
¶ 19. Progressive claims that All Care did not present evidence that tended to link the effects of Muench's conduct to any quantifiable part of the decline in All Care's business. Progressive asserts that there was no evidence from which a jury could find that All Care lost any particular number of patients, or any amount of income, as a result of Muench's dealings with the attorneys All Care presented. Further, Progressive argues that the testimony of All Care's witnesses was insufficient to establish a "fair and approximate loss" as required by MBF. MBF, 663 So.2d at 599. Finally, Progressive suggests that a survey of the two hundred attorneys who referred clients to All Care would have been the best method to establish how many attorneys were dissuaded from dealing with All Care due to Muench's actions, as well as to what extent attorneys were dissuaded from dealing with All Care.
¶ 20. Interpreting the evidence at trial, one could argue that the evidence does not show that Muench was the sole cause of All Care's losses. Just as in MBF, numerous other factors could have played various roles in All Care's demise. Regarding Muench's impact, of the thousands of claims that passed through All Care, Progressive handled fewer than two dozen claims. Regarding other possible factors, shortly after All Care arrived on the Jackson medical market, numerous competitors quickly followed suit. All Care was a subsidiary of Neuro-Diagnostics Associates, Inc. (NDA). Other NDA clinics went out of business. In fact, NDA had fifteen to twenty clinics operating in 1998. By January of 2003, only nine of those clinics remained in operation.
¶ 21. While numerous factors may have played various roles in All Care's demise, it requires no assumption to recognize that the evidence showed All Care's clientele was almost entirely patient referrals from personal injury attorneys. Evidence also showed that attorneys decided to stop sending clients to All Care because of Muench's actions, particularly Muench's comments that All Care was under investigation by the state attorney general and the medical licensure board. Evidence also showed that Muench told an attorney *223 that All Care was illegally practicing physical therapy and mailed a letter to another attorney and claimed that All Care was unlawfully billing for physical therapy, when All Care did not. Finally, evidence demonstrated that Muench told an attorney that All Care did not employ physicians that were qualified to practice medicine. None of these allegations were true and Muench, at best, could only reach those conclusions through misguided and unfounded interpretations. At worst, Muench fabricated them.
¶ 22. Thus, the evidence could lead a hypothetical jury to conclude that Muench's actions caused harm to All Care. But does that mean that the evidence was sufficiently presented to allow the jury to create a fair and approximate calculation of damages? Some could conclude that a survey of those attorneys who referred clients to All Care would have amounted to sufficient proof of quantifiable damages. One possible interpretation of the evidence is that All Care's proof of damages is not a sufficiently specific measure of damages to carry a claim of tortious interference with business relations.
¶ 23. However, All Care presented evidence that their largest referral source, Don Evans, made his decision to stop sending clients to All Care largely due to Muench's actions and disclosures. Andy Stewart testified that he referred his clientele elsewhere due to many factors, but mainly because (1) he had such a difficult time settling cases with Muench and (2) Muench made such derogatory statements about All Care. Marc Pearson called Muench's criticisms and tactics "highly unusual" and testified that he stopped sending his clients to All Care because he "just didn't want the hassle." Accordingly, the record reflects that Muench caused All Care's largest source of referrals, among others, to cease doing business with All Care.
¶ 24. More problematic, any attempt to quantify All Care's losses, given the circumstances, can only be accomplished based on a fair degree of speculation. There is no gauge by which we or the jury can attempt to calculate any reasonably exact amount of loss that resulted from the attorneys' decisions to direct clients to other medical providers. Each attorney referral that would direct a client to All Care would be based upon different facts or circumstances that led the client to seek legal assistance. Consequently, each injury would be specifically varied from the next, requiring varied treatment and a similarly varied fee. Each case would require individual treatment without uniform costs. Accordingly, no singular estimate could serve as a "basic charge" or standard fee. As a result, the jury could only act fairly by calculating an approximate amount of damages. As stated above, a party will not escape liability for lack of a perfect measure of damages. MBF, 663 So.2d at 599. Causation must be as specific and certain as the nature of the particular case may permit. Freeman v. Huseman Oil Int'l, Inc., 717 So.2d 742(¶ 13) (Miss.1998). However, "the right to recover is not precluded by uncertainty regarding the exact amount of damages." Fred's Stores, 725 So.2d at (¶ 44). "The evidence need only lay a foundation upon which the trier of fact can form a fair and reasonable amount of ... damages." Id. (quoting Ham Marine, Inc. v. Dresser Industries, Inc., 72 F.3d 454, 462 (5th Cir.1995)).
¶ 25. One important consideration is whether All Care presented evidence that Muench's claims spread among the legal community. While Evans only testified that he thought he discussed his problems with All Care with other attorneys, one could conclude that, based on the notion *224 that Evans did not testify as to whom he talked to, did not identify how many lawyers he talked to and only thought he may have talked to other attorneys, then All Care did not present sufficient evidence of decline in referrals due to Muench. However, if Progressive wanted to demonstrate any flaws in Evans' testimony, Progressive was free to do so on cross-examination.
¶ 26. The weight of Evans' testimony was a jury consideration, one that the jury certainly exercised. Moreover, whether Evans' comments spread among the legal community, as a whole, is irrelevant. The proper consideration would be whether Evans' comments spread among that group of lawyers who would need to refer clients to lien billing medical providers: attorneys who operate on a contingency fee basis on behalf of clients that lack the ability to pay for services until after resolution of their claims. Regardless, Evans responded affirmatively, albeit without conviction. Certainly Evans did not respond that he did not speak about All Care with his colleagues.
¶ 27. No precedent indicates that calculating damages depends on perfect calculation, prediction, exactness, or precognitive skill. Rather, the calculations should be exact as possible. E.g., Freeman, 717 So.2d at (¶ 13). Perfection is not the intended line of demarcation. There is no perfect trial. Our system of justice is the best system that imperfect humans have developed. Called upon to resolve disputes, we use the jury system to allow citizenry to allocate justice as the law permits. Here, the jury determined that All Care proved sufficiently quantifiable damages. While it is not impossible that a jury could err, in this case, the jury had enough evidence to quantify damages. Our standard of review mandates affirming such findings. Wal-Mart Stores, 818 So.2d at (¶ 16). By the nature of this case, any attempt to quantify an exact measure of loss would have to be speculative inasmuch as the claims and clients are speculative. How could All Care possibly predict what injuries would "come through the door?" How could All Care predict treatment for those speculative injuries?
¶ 28. While the testimony did not indicate that Muench caused all of All Care's business failure, there was evidence that indicated Muench caused All Care to suffer damages, albeit the evidence did not demonstrate to what degree Muench caused All Care's demise and the amount was not necessarily exact. Still, the evidence was sufficiently presented to allow a fair and approximate calculation of damages.

III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE DAMAGES TESTIMONY OF DR. STAN SMITH TO BE HEARD BY THE JURY.
¶ 29. The substance of this issue involves expert testimony by Dr. Stan Smith. All Care presented Dr. Smith's testimony on the element of damages. Dr. Smith testified that All Care suffered a precise amount of loss, beginning in 1997. Dr. Smith predicted that over a thirty year period, All Care's future lost income would total $16,430,932, though the jury did not return a corresponding damages award.
¶ 30. In this final issue, Progressive asserts that the circuit court's decision to allow Dr. Smith's testimony constitutes reversible error. Progressive further asserts that Dr. Smith's testimony (1) failed to connect All Care's losses to Muench, (2) was based on speculation, (3) was based on demonstratively false assumptions, and (4) bore no relation to the evidence. Progressive concludes that the circuit court's decision to allow Dr. Smith's testimony resulted in violations of Rules *225 402, 403, 702, and/or 703 of the Mississippi Rules of Evidence. Admission of expert testimony is within the trial judge's discretion. Mississippi Transp. Com'n v. McLemore, 863 So.2d 31(¶ 4) (Miss.2003). We are mindful that, on appeal, the decision of a trial judge regarding the admission or suppression of evidence will stand "unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion." Id.
¶ 31. Dr. Smith testified as an expert. At the time of trial, the standard in Mississippi for the admission of expert witness testimony was the "general acceptance" test. Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).[1] Expert testimony should be admitted only after a two-pronged inquiry. M.R.E. 702. First, the witness must be qualified as an expert because of the knowledge, skill, experience, training, or education he or she possesses. Id.; see also, Watkins v. U-Haul Int'l, Inc., 770 So.2d 970(¶ 10) (Miss.Ct.App.2000). Second, the witness's scientific, technical, or other specialized knowledge must assist the trier of fact. Watkins, 770 So.2d at (¶ 10). In order to meet this second prong, the expert's methodology must have been "sufficiently established to have gained general acceptance in the particular field to which it belongs." Comment to M.R.E. 702 (citing Frye, 293 F. at 1014).
¶ 32. Progressive argues that Dr. Smith failed the first and second prongs of the M.R.E. 702 inquiry. Progressive asserts that Dr. Smith is an expert in hedonic damages, while this case requires a calculation of lost future net profits for a commercial enterprise. While it is true that Dr. Smith has qualified as an expert in over one hundred cases regarding hedonic damages, and has written a text on the subject, Dr. Smith's "primary" area of expertise, so to speak, is irrelevant to this issue. The relevant inquiry is whether Dr. Smith's testimony is admissible under Frye and the Mississippi Rules of Evidence.
¶ 33. "[A] theory or method is not generally accepted when it is unique to a particular situation, not taught or discussed in courses or textbooks, `breaks new ground,' and is not used by other practitioners in that particular field." McLemore, 863 So.2d at (¶ 40). While Progressive does not assert that computation of lost future business profits is unique or groundbreaking, Progressive does challenge Dr. Smith's methodology on numerous grounds. Progressive notes that Dr. Smith admitted that he had no idea why All Care's business declined, and offered no opinion that the decline was caused by Progressive. All Care responds that Dr. Smith's role was to establish damages stemming from Muench's actions, rather than to establish causation of All Care's decline. Just because Dr. Smith did not establish causation does not make his testimony inadmissible. Dr. Smith testified as an expert witness to establish damages, not causation.
¶ 34. Progressive also claims that Dr. Smith's methodology was unhelpful to the jury because Dr. Smith undertook no research to determine the number of medical clinics that the Jackson market could support, or how many years such a clinic could operate. Further, Progressive asserts that Dr. Smith was excessively liberal *226 in calculating All Care's lost profits because Dr. Smith failed to consider mitigating circumstances in arriving at his damages figure. In essence, Progressive argues that Dr. Smith should have been required to discount those losses that All Care suffered due to other factors that affected All Care's business failure.
¶ 35. While it is proper to set off losses caused by other factors, it is Progressive's duty to present such evidence, either through cross-examination or independent testimony and documentary evidence. Accordingly, the jury, as finders of fact, bears the responsibility for calculating damages. Moreover, the jury did not grant the damages figure that Dr. Smith derived. Rather, the jury granted significantly reduced damages. It is not outside the realm of possibility to view the jury's findings as their decision to weigh other factors affecting the business's failure against Muench's liability.
¶ 36. Progressive also argues that Dr. Smith's testimony was not relevant and helpful to the jury because Dr. Smith erred in considering All Care's weekly patient capacity and operating expenses. In finding fault with Dr. Smith's stated weekly patient capacity, Progressive argues that no testimony in the record showed that All Care actually treated 275 patients in a given week. However, All Care did present evidence that indicated that it operated at that capacity, if only briefly. The jury also had an opportunity to scrutinize that testimony against documentary evidence that demonstrated the number of patients that All Care actually treated.
¶ 37. Regarding the contention that material facts must be sufficient in scope for the witness to form a rational opinion, the documentary evidence, combined with Dr. Smith's testimony, was sufficient for the witness to formulate a rational opinion, especially in light of the jury's amended damages figure.
¶ 38. A trial judge abuses his discretion when he allows an expert to testify while relying on data that was not reasonably accurate. APAC-Mississippi, Inc. v. Goodman, 803 So.2d 1177(¶ 30) (Miss.2002). However, the supreme court qualified that proposition by defining why such data is not reasonably accurate: it was provided by the plaintiff's counsel's estimates and not reflected on the plaintiff's records. Id. Here, the data was not entirely provided by plaintiff's counsel but was reflected in the plaintiff's records as well.
¶ 39. Finally, Progressive asserts that Dr. Smith's testimony was inadmissible under M.R.E. 403. Rule 403 of the Mississippi Rules of Evidence states that evidence, though relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." M.R.E. 403. There can be no doubt that Dr. Smith's testimony was prejudicial to Progressive. It would defy logic if All Care attempted to use an expert to demonstrate damages if that expert's testimony did not prejudice Progressive in some way. Still, that prejudice does not outweigh the probative value of Dr. Smith's testimony.
¶ 40. Progressive takes issue with Dr. Smith's assumptions and facts and the way they affected his testimony. In reaching the conclusion that Dr. Smith's testimony did not assist the trier of fact, Progressive argues that a court must be wary because expert testimony based on speculative information may convey an impression of exactness where a jury's common sense is less available than usual to protect it. Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 145 (4th Cir.1994). Progressive argues that the trial judge abdicated *227 his role as a gatekeeper because a party may not assume facts not in evidence or unsupported by the evidence or omit material undisputed facts as a basis for arriving at an expert opinion. Magnolia Hosp. v. Moore, 320 So.2d 793, 799 (Miss.1975). As discussed above, Dr. Smith could not provide an exact, unequivocally quantifiable amount of damages because All Care's fees would vary according to a patient's necessary treatments. Moreover, if Progressive would have presented contradictory or impeachment evidence, through Dr. Smith or its own expert, any inconsistencies would have come to light. At any rate, the jury applied their judgment and adjusted the damages to conform to the amount they deemed appropriate.
¶ 41. Progressive points out that All Care sought to prove Muench was the sole cause of their damages. It requires no assumption to conclude that even if the jury failed to find that Muench was the sole cause of All Care's loss, the jury could still find that Muench was at least a cause or even a significant cause of All Care's demise. Regardless, there was sufficient evidence to lead the jury to its conclusion. Especially when, based on the nature of the case, it seems impossible to arrive at an ascertainable level of approximate damages. Further, it is not "certain" that the jury afforded Dr. Smith's testimony undue weight, nor was the trial judge's decision clearly erroneous, amounting to an abuse of discretion.
¶ 42. Dr. Smith's testimony was the only specific damages testimony. If Progressive had an expert that could contradict Dr. Smith's valuation, it should have presented that witness. Progressive was free to cross-examine Smith and impeach his testimony. This Court should hesitate to create precedent that allows for reversible error where one side disagrees with the other side's methodology in calculating damages. Rather, it is an attorney's duty to impeach an adversarial damages witness, or cast doubt on his testimony with one's own expert, rather than claim "the jury got it wrong" in an appeal. Suffice it to say, we affirm the trial judge's decision to admit Dr. Smith's testimony.
¶ 43. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE, P.J. AND MYERS, J., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION. ISHEE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J., AND GRIFFIS, J., JOINS AS TO ISSUES II AND III. BARNES, J., NOT PARTICIPATING.
GRIFFIS, J., Dissenting.
¶ 44. With much respect for the majority, I must dissent. I am of the opinion that this case should be reversed and rendered.

I. Whether All Care failed to prove that Progressive Defendants acted with a malicious intent to harm All Care's business, without a legitimate purpose or justifiable reason.
¶ 45. All Care had the burden to prove that Muench's actions:
(a) were willful and intentional,
(b) were calculated to cause damage to All Care's lawful business,
(c) were without right or justifiable cause (which constitutes malice); and
(d) caused actual damage and loss.
*228 MBF Corp. v. Century Bus. Comm'ns, Inc., 663 So.2d 595, 598 (Miss.1995). Here, there was no legally sufficient proof on several of the elements.
¶ 46. All Care failed to prove that Muench's actions were calculated to cause actual damage and loss to All Care's lawful business and that those actions were without right or justifiable cause. Hopewell Enter., Inc. v. Trustmark Nat'l Bank, 680 So.2d 812, 818 (Miss.1996). No tortious interference can occur if the defendant's conduct had a legitimate, employment-related objective. Id. at 819. So long as the defendant undisputedly has a legitimate business reason for becoming involved in the plaintiff's business, there is no tortious interference. Id.
¶ 47. All Care claims that Muench criticized its practices and sought reductions of its bills for the benefit of Progressive's insureds. It was an integral part of his job as an insurance adjuster to evaluate claims and conduct settlement negotiations. The fact that Muench's actions may have inconvenienced or cost All Care money simply does not make those actions unlawful. See Hall v. Mid-America Dairymen, Inc., 727 So.2d 776, 779(¶ 15) (Miss.Ct.App.1999) (finding that "[a]lthough Mid-America's new policy may have had an adverse economic impact on H & H, there has been no showing that the measure was in any way unlawful").
¶ 48. It is a routine, indeed expected, practice for an insurer to question whether medical treatment and claims are reasonable and necessary under the circumstances of each case. To seek the reduction in the amount of medical claims by identifying problems with medical bills and to ask an attorney to reduce the amount requested is an expected, legitimate and justifiable part of the claims adjusting process. Certainly, Muench was proficient at his job. The attorneys he dealt with recognized this, and each attorney testified that they eventually settled their claim with Progressive.
¶ 49. Muench's criticism of All Care's business practices does not support a finding of malicious intent. There was no evidence of a deliberate effort by Muench to damage or injure All Care. Indeed, Muench settled each and every All Care claim he handled. According to the testimony of the attorneys, Muench made fair offers on each and every All Care claim. All Care accepted reduced payments in these cases.
¶ 50. The majority incorrectly concludes that Muench's comments went well beyond his role as an insurance adjuster. The majority finds that Muench alleged that All Care was under investigation by the state attorney general, and it was not. The deposition of Linda Flowers, an adjuster for Nationwide, indicates that Nationwide referred All Care for investigation by the National Insurance Crimes Bureau ("NICB"), an industry trade organization. According to the deposition of Jerry Davis, a NICB agent, the NICB investigation was joined with an FBI investigation of NDA, All Care's parent corporation, and Ralph Small, its principal owner. The trial court judge did not allow the jury to learn of this investigation. Indeed, there may not have been an investigation by the state attorney general but there was an investigation about NDA and its business practices.
¶ 51. Next, the majority finds that Muench told an attorney that All Care illegally practiced physical therapy when it did not practice physical therapy at all. The evidence contradicts this finding. All Care held itself out to be a physical rehabilitation clinic. Physical rehabilitation includes physical therapy. Nathaniel Randolph, who was accepted by the trial court as an expert witness, testified as follows:

*229 Q. Do you know what physical medicine is as it relates to physical therapy?
A. Yes, sir.
Q. Tell us about that.
A. Physical medicine and rehabilitation is the name of the field. It's a medical field. It focuses on restoring function. In patients that have disabilities caused by injury, disease, catastrophic events such as strokes, paraplegics, amputees, traumatic brain injury, those type of patients, those they're treated with physical measures.
The physical measures are used in the treatment of physical medicine patients are implemented by the physical therapist.
Q. How does physical therapy relate to physical medicine and rehabilitation?
A. It's the same thing except you have a physical therapist who is an allied health professional. We are concerned with restoring function. We use physical measures and we use those physical measures, which would be the modalities, as well as exercise activities.
¶ 52. Randolph further testified that physical medicine and rehabilitation is the same as physical therapy. Specifically, Randolph stated, "[p]hysical medicine treatment is physical therapy treatment. Physical therapy treatment is physical medicine treatment. Physical medicine is a category under which physical therapy falls and the term over the years has become physical therapy as part of physical medicine and rehabilitation." Thus, despite a contention to the contrary, as a physical medicine and rehabilitation facility, All Care practiced and therefore billed for physical therapy.
¶ 53. All Care practiced physical therapy and billed for physical therapy services, yet it did not employ licensed physical therapists. Instead, All Care employed medical assistants, none of whom were licensed, to assist physicians. In Mississippi, only licensed physical therapists, or licensed physical therapist assistants under the direct supervision of a licensed physical therapist, may provide physical therapy services. See Miss.Code Ann. §§ 73-23-35-73-23-39 (Rev.2004). Thus, Muench's comments were indeed accurate.
¶ 54. The majority also finds that the physicians employed by All Care were all licensed to practice medicine. It is true that All Care's physicians were all licensed. However, the physicians were not licensed in the area of physical medicine and rehabilitation. All Care made no effort to find physicians with experience in treating soft tissue injuries. Instead, All Care solicited doctors, any doctors, via a mass mail-out sent to every licensed physician in Mississippi. The mass mail-out encouraged physicians of all specialties to apply. Sylvester York, a former employee of All Care's parent company, testified that "[a]nybody that had a medical degree[,] that had M.D. in front of their name was okay to hire.... It didn't matter. As long as you was [sic] an M.D. you can work at any of our physical medicine and rehabilitation centers."
¶ 55. All Care's physicians were typically trained in areas unrelated to physical medicine and rehabilitation. For instance, Dr. William Jefferson Bell, who received his medical degree in 1951, was a "semi-retired" anesthesiologist before going to work for All Care. Also, Dr. Oliver W. Cunningham, who received his medical degree in 1976, made disability determinations for the V.A. and Social Security Administration prior to his work at All Care. In fact, All care did not train or evaluate the performance of its physicians.
*230 ¶ 56. There was substantial evidence to suggest that Muench's comments were justified and not based on some "misunderstanding" or "unfounded interpretation." Contrary to the majority's conclusion, there was sufficient evidence to support Muench's criticism. I fail to see how factually correct criticisms of a medical provider by an insurance adjuster, who stands in an adversarial relationship to that provider, can be viewed as evidence of malice.
¶ 57. Because insureds have a legitimate interest in not paying more for claims than is justified, Muench's effort to reduce the amount of medical bills was not "without right or justifiable cause." Hopewell Enter., Inc., 680 So.2d at 818. Thus, even if Muench's actions inconvenienced All Care, caused it to revise its billing practices, or even cost it money by causing it to recover less than one hundred percent (100%) of some of the medical charges submitted, this conduct was not tortious interference with business relations. Muench's actions were in furtherance of Progressive's legitimate business interest and were an integral part of settling claims on behalf of its insureds.
¶ 58. I am of the opinion that there was not sufficient evidence to establish that Muench acted with malicious intent. I disagree with the majority on issue I. I would reverse and render.

II. Whether All Care failed to prove that the Progressive Defendants proximately caused quantifiable damages to All Care.
¶ 59. I join Judge Ishee's separate opinion as to issue II, and I dissent from the majority. Nevertheless, I offer additional reasons for my dissent.
¶ 60. The majority incorrectly finds All Care's proof of damages sufficient. A plaintiff in a tortious interference case must prove his damages with specificity. Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc., 725 So.2d 902, 914(¶ 43) (Miss.1998). It is not enough to show that the defendant's actions negatively affected the plaintiff's business. Id. Rather, a plaintiff must prove its lost profits with as much detail as possible and must establish that these damages were caused by the defendant. Id.
¶ 61. Over two hundred attorneys referred patients to All Care. However, All Care presented evidence from only four of the attorneys. No other evidence of causation was presented. None of the attorneys provided any evidence of the income that would have been generated by All Care had they not dealt with Muench. None of the attorneys, or any other witness, ruled out other possible causes of All Care's decline in business. There was no other testimony from which a jury could have found that Muench's actions caused All Care to lose business. There was no other evidence from which a jury could have determined the amount of losses caused by Muench.
¶ 62. All Care closed its clinic in July or August of 1997. After one weekend, All Care's parent opened another clinic, East River, in a nearby location. The East River clinic was opened for the purpose of replacing the All Care clinic. East River began seeing the same patients, employed the same personnel, and even used some of the same equipment as All Care. East River was in operation at the time of trial. Thus, at the time of trial, through East River, NDA was conducting the same or similar business for which it complains that it lost through the closing of All Care.
¶ 63. From all of the evidence, I fail to see how All Care carried its burden on the element of "actual damage and loss." I agree with Judge Ishee that this issue requires that we reverse and render.

*231 III. Whether the trial court erred in allowing the damages testimony of Dr. Stan Smith to be heard by the jury.

¶ 64. I join Judge Ishee's separate opinion as to issue III, and I dissent from the majority. I offer additional reasons for my dissent.
¶ 65. Dr. Smith was All Care's only witness on damages. However, his testimony failed to connect All Care's business losses to Muench. Smith's testimony was not based on any expertise in medical clinics that treated soft tissue injuries; it was not based on research specific to the economics of medical clinics; and it was not based on market research to determine the number of clinics the Jackson market could support or how many years such a clinic could be expected to operate.
¶ 66. Instead, Smith's testimony was based on a series of wholly unsupported assumptions. It was wildly speculative. Smith's testimony ignored the actual number of All Care patients, its actual expenses, and other factors that undoubtedly affected its profitability, such as increased competition and NDA's decision to open East River, a successor clinic across town.
¶ 67. An expert's testimony that ignores contradictory evidence is inadmissible and cannot support a jury verdict. APAC-Mississippi, Inc. v. Goodman, 803 So.2d 1177, 1184-85 (¶¶ 29-30) (Miss.2002); Hickox v. Holleman, 502 So.2d 626, 638 (Miss.1987) (overruled on other grounds). Expert testimony based on assumptions without factual foundation is often excluded under Mississippi Rule of Evidence 403 because of its undue prejudicial effect and potential to confuse the jury. Since Smith's opinions and testimony were based on unfounded assumptions and speculation, the admission of such evidence was unduly prejudicial to Progressive. Therefore, I am of the opinion that the majority is incorrect to affirm on this issue. I would reverse and render on issue III.
ISHEE, J., Concurring in Part and Dissenting in Part.
¶ 68. I agree with the majority's decision that this Court should affirm the verdict in favor of All Care as to the issue I, the issue of malicious intent. However, I must respectfully dissent from the majority's determination as to issues II and III.

I. Whether All Care failed to prove that Progressive proximately caused quantifiable damages to All Care.
¶ 69. The majority disagrees with Progressive's assertion that All Care failed to prove that Muench's actions caused quantifiable damages to All Care. The damages that All Care attempted to show at trial were primarily supported through the testimony of four attorneys out of the more than two hundred who referred patients to All Care. Furthermore, Progressive asserts that even if damages could be inferred from the testimony at trial, there was no evidence presented from which a jury could determine the amount of damages incurred.
¶ 70. The standard for proving the elements of causation and damages in a tortious interference are clearly established in Mississippi law. MBF Corp. v. Century Bus. Communications, Inc., A Subsidiary of Century Telephone Enterprises, Inc., 663 So.2d 595, 598 (Miss.1995). In MBF Corp., the Mississippi Supreme Court found that the actions of a former MBF employee later employed by Century "went far beyond the realm of legitimate competition, including the salesmen' actions of selling supplies on behalf of Century while still under the employ of MBF, the removal of customer files and inventory *232 from MBF, the removal of customer files and inventory from the premises" and "information spread to customers by Higginbotham that MBF was closing its Jackson branch." MBF Corp., 663 So.2d at 599.
¶ 71. The plaintiff's in MBF Corp. appealed the trial court's decision granting a motion for directed verdict in favor of Century for MBF's failure to prove the elements of tortious interference. In reversing the trial court, the Supreme Court of Mississippi concluded that "MBF met the burden of proof needed to establish a prima facie case of damages, which includes showing that the financial loss was caused by Century's behavior." Id. In reaching this decision, the court cited MBF's introduction at trial of financial statements evidencing a decline in income. Id.
¶ 72. Just as in MBF Corp., the attorneys for All Care admitted quarterly billing summaries, payment summaries, and referral summaries in an effort to prove damages at trial. All Care asserts that MBF Corp. stands for the proposition that "a prima facie case of damages was established when a company showed only that its competitor performed unlawful acts and that subsequently the plaintiff's profits and customer trade sharply declined, as proven by financial statements." In short, All Care asserts that showing a mere loss of business and referrals is sufficient to establish loss and causation due to the actions of Progressive.
¶ 73. The position taken by All Care appears to be an oversimplification of the decision in MBF Corp. In MBF Corp., the court held that the proffer of financial statements alone, but especially when viewed in conjunction with other evidence, was enough to evince damages such that MBF should have survived a motion for directed verdict. MBF Corp., 663 So.2d at 600. However, to say that financial statements alone are sufficient to survive a motion for directed verdict is one thing. To say that such statements are proof that a given defendant has caused the losses shown on a given statement, sufficient to prevail at trial on a claim of tortious interference, is another. To hold as such would be to ignore the rest of the court's discussion in the MBF Corp. case.
¶ 74. In MBF Corp., the Mississippi Supreme Court reaffirmed the requirement that the plaintiff in a tortious interference case carries the burden of establishing "actual damage and loss." Id. at 598. The court in MBF Corp. elaborated upon the extent to which damages must be specifically proven when it wrote that a party "will not be able to escape liability because of the lack of a perfect measure for damages ... Therefore, a reasonable basis for computation [of damages] and the best evidence which is obtainable under the circumstances of the case, and which will enable the trier of fact to arrive at a fair approximate estimate of loss is sufficient proof." MBF Corp., 663 So.2d at 599 (citing Koehring Co. v. Hyde Constr. Co., 254 Miss. 214, 251, 178 So.2d 838, 853 (1965)). In reaching a "fair and approximate" estimate of loss, the court in MBF Corp. recognized that other factors, "such as the loss of two key salesmen, and the failure to hire additional staff to replace them, may have also contributed to MBF's financial ruin, that is a question for the finder of fact to determine after a full trial on the merits." Id. As such, the court reversed the directed verdict and remanded the issue of damages to the circuit court. MBF Corp., 663 So.2d at 600.
¶ 75. The question of the sufficiency of All Care's financial statements, as well as the weight of "other factors," primarily in the form of the testimony of four personal injury attorneys to establish causation at trial, provide the operative nucleus of Progressive's *233 argument on appeal. Progressive argues:
All Care's proof on causation and damages was limited to anecdotal evidence from four attorneys (out of more than two hundred attorneys who referred patients to All Care), and billing and payment summaries that showed a decrease in All Care's patient inventory and receivables between 1995 and 1997. But All Care provided no proof to link the effects of Muench's conduct with these four attorneys to any quantifiable part of the decline in All Care's business. There was simply no evidence from which a jury could find that All Care lost any particular number of patients, or any amount of income, as a result of Muench's dealings with Charlene Priester, Andy Stewart, Don Evans, or Mark Pearson.
In short, Progressive argues that the losses shown on All Care's financial statements show that the business was failing badly months before the most egregious of Muench's actions, if his actions can be couched in such terms when compared to the actions of the defendants in MBF Corp., and that the testimony of All Care's witnesses is not sufficient to establish even a "fair and approximate loss" as required by MBF Corp. Finally, Progressive asserts that a survey of the 200 attorneys who referred clients to All Care could have easily been used to establish how many attorneys were dissuaded from dealing with All Care due to the actions of Muench, as well as to what extent.
¶ 76. All Care relies upon Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc., 725 So.2d 902, 913 (¶ 36) (Miss.1998) to suggest that the financial statements in evidence at trial, along with the testimony of a handful of personal injury attorneys, more than suffices as an adequate showing of causation and damages. In Fred's Stores, a former employee of Super D pharmacy took a list of pharmacy customers and their spending histories and sent targeted mailings in an effort to induce the customers to switch to Fred's. Fred's Store's of Mississippi, Inc., 725 So.2d at 904-05(¶ 2). At trial, Super D entered into evidence a list of 150 customers who had moved to Fred's and how much money they had spent at Fred's. Id. at 913 (¶ 37). On appeal, Fred's argued that customers on the list should have testified that they chose to shop at Fred's instead of Super D because of the letters sent by the former employee, and that the list of customers was insufficient proof of proximate cause. Id. at 912 (¶ 34). In Fred's Stores, the Mississippi Supreme Court held that no testimony was required from past customers as the list in evidence consisted of "hard proof" of the business' financial losses. Id. at 913 (¶ 37).
¶ 77. The exploration of the sufficiency of the financial and attorney referral statements offered by All Care is of paramount importance in the case before this Court. The list of customers in Fred's Stores illustrated precisely which customers ceased to use Super D in favor of Fred's Stores, and the exact amount of business lost from each customer, thus sufficing as "hard proof" in the eyes of the court. Id. What is clear from the exhibits submitted by All Care at trial is that the numbers of clients visiting All Care, the amount billed in dollars, and ultimately All Care's profitability, plummeted precipitously after the fourth quarter of 1995. What these exhibits clearly do not show, as All Care asserts, is that the losses sustained prove sufficiently that Muench is the sole cause of the losses. Clearly, the evidence presented by All Care falls far short of the "hard evidence" presented in Fred's Stores. In fact, the exhibits can hardly be said to be utilitarian in determining to what extent Muench is responsible for any quantifiable portion of *234 the shown losses, that would be useful to the trier of fact, as required in MBF Corp.
¶ 78. Just as in MBF Corp., numerous other factors may be fairly assumed to have played various roles in the demise of All Care. In regards to the impact of Muench, it is illuminating to note that of the thousands of claims that passed through All Care, Progressive handled fewer than two dozen claims. Testimony from various sources, discussed infra, shows that All Care's billing practices gave cause for an increased level of scrutiny on the part of numerous insurance companies. It is apparent from the record that the posture of various local insurance companies toward All Care became increasingly combative. This negative environment is best highlighted by an incident whereby All Care had a Nationwide adjuster arrested for allegedly trespassing at the clinic.
¶ 79. Also of import in the demise of All Care is the fact that shortly after All Care arrived on the Jackson medical scene, competitors such as the PM & R Clinic, Lakeland Physician's Group, and the Lane Foundation quickly followed suit. All Care was a subsidiary of Neuro-Diagnostics Associates, Inc. ("NDA"). Clinics in the NDA family faired, on the whole, little better than All Care. The record reflects that NDA had fifteen to twenty clinics in operation in late 1998. However, by January 2003, only nine remained.
¶ 80. A close examination of the testimony of the four personal injury attorneys is illuminating in evaluating whether a jury could have placed all or any part of the impetus for All Care's demise on the shoulders of Muench and Progressive. Attorney Evans testified on direct examination:
Every time I'd have a case with him [Muench] it would take me thirty minutes argument every time and just wear me out. So, as a result, from all his conversations and all of the battle, I finally concluded that I just couldn't send any more clients up there.
However, on cross-examination Evans conceded that he also had problems with All-state and Nationwide, and that those problems also affected his decision to stop sending clients to All Care. Furthermore, Evans admitted that the other insurance companies made similar complaints as had Muench, and although Muench's criticisms were those that stood out in his mind, those criticisms may have been justified.
¶ 81. Attorney Priester acknowledged on direct examination that, in her deposition from a prior case, she stopped sending clients to All Care due to the problems she had with Michael Muench and Progressive, and the problems that she understood she was "going to have with all other insurance companies." She further testified that Muench indicated that he "didn't think very much of this clinic" and that "he thought they were under investigation." However, on cross-examination Priester admitted that she settled her claim with Muench for a fair figure, and that she never discussed her conversations with Muench with anyone. Finally, Priester testified that she was not a referral source for All Care, and that any clients who went to the clinic did so on their own.
¶ 82. Attorney Stewart settled his lone case involving Muench and All Care. Stewart testified on direct that the reason he ceased sending clients to All Care was "a combination of a lot of factors but the main reason was the fact that we were having such a difficult time settling cases with Progressive Insurance Company and their adjuster, Mike Muench, and things that he was telling me about that clinic, we decided that it was best just to stay away." On cross-examination Stewart conceded that the arrest of Nationwide adjuster Linda Flowers was another "small" factor in *235 leaving All Care off of his "oral" list of medical providers, as well. Stewart also acknowledged that the nature of his practice had moved away from personal injury litigation, and that other "lien billing" clinics had entered the Jackson market which subsequently appeared on his list of suggested medical clinics.
¶ 83. Attorney Pearson testified that after only one claim involving Muench and All Care, Muench's conduct was such that he would no longer send clients to the clinic. On cross-examination Pearson admitted that other reasons existed for his choice to end referrals to All Care. Like Attorney Stewart, the nature of Pearson's practice shifted away from personal injury "car wreck" claims.
¶ 84. After examining the evidence presented at trial, it seems clear that the jury could have found that the actions of Muench and Progressive caused some manner of harm to All Care. The question then becomes whether the evidence was sufficiently presented to allow the jury to create a "fair and approximate" calculation of damages as required by MBF.
¶ 85. Taken most favorably to All Care, the evidence at trial was insufficiently "approximate" to establish the element of damages. It bears repeating that the losses shown on paper by All Care, whether in absolute dollars or number of referrals, are insufficient on their own to allow All Care to prevail on their tortious interference claim. Furthermore, the testimony of All Care's witnesses, while perhaps indicating some loss to All Care as to those individuals, is insufficient in bolstering the loss statements such that they become "hard evidence" of causation.
¶ 86. Progressive is correct in its assertion that stronger evidence was required, and not incidentally, was readily available. It is clear that there was no need to parade all 200 referring attorneys to the stand, as indicated by Fred's Stores. However, a survey of all of the attorneys, through interviews or affidavits, would have allowed testimony regarding the impact of Muench's actions on attorney decision making. Such a survey, readily available, would have allowed the trier of fact to reach an infinitely more "fair and approximate" determination of the losses caused by Muench.
¶ 87. Without such evidence, the connection between Muench's actions and the losses accrued by All Care becomes so tenuous that to place the blame upon it for the failure of the entire venture is, to my mind, manifestly unjust. The testimony of All Cares witnesses was also insufficient for two reasons. First, when taken in the light most favorable to All Care, the testimony at trial shows some loss suffered by All Care due to Muench's role as a "major factor" in each of the attorney's decision to stop referring to All Care. However, even as to these four attorneys, no specific measure of damages was presented by All Care due to the loss of the attorney's referral business. All Care could have easily shown the total number of referrals lost from the four attorneys, and thus shown a sufficiently approximate measure of damages such as to satisfy MBF Corp. Instead, All Care attempted to show that the four attorneys sufficiently represented the entire class of referring attorneys, and that such testimony, in conjunction with All Care's business statements, was sufficient for the purpose of establishing causation and damages. The argument of All Care is, in essence, that the loss of referrals from four attorneys, without further "hard proof," is sufficient to show the failure of the entire business as witnessed on paper. This theory is dubious at best.
¶ 88. Second, All Care attempted to show through its testimony that Muench's assertion regarding All Care spread *236 through the attorneys of greater Jackson by word of mouth, thus broadening the losses suffered by the medical center. Attorney Priester never discussed her conversations with Muench with anyone, and thus her testimony clearly contradicts All Care's contention that Muench's actions spread beyond her single conversation. Attorney Stewart continued to send clients to All Care after his single claim with Muench. Neither Stewart nor Pearson testified that either discussed his conversations with Muench with any third party.
¶ 89. Finally, Attorney Evans, provided scant support for All Care's assertion as well. Evans was questioned about his discussions with other attorneys as follows:
Q: Did you ever have any discussion with any of you colleagues in the practice of law in this area that were handling personal injury cases about problems you were having with All Care?
A: I think I did.
In other words, Evans did not testify as to whom he may have talked, did not identify any particular number of lawyers with whom he may have discussed All Care, and in fact, only thinks he may have talked to other lawyers about his problems with All Care. Such testimony clearly cannot support the contention that Muench's assertions actually spread throughout the legal community.
¶ 90. Finally, proof on causation must be as specific and certain "as the nature of the particular case may permit." Freeman v. Huseman Oil Int'l, Inc., 717 So.2d 742, 746 (¶ 13) (Miss.1998). Although easily presentable, no testimony or evidence was put forth at trial from which the jury could find an approximate dollar amount lost by the decision to stop utilizing All Care on the part of personal injury attorneys. Furthermore, no testimony or other evidence was presented by All Care to show if the rest of All Care's business failure could be attributed to Muench and Progressive. For this reason I must respectfully dissent from the majority's holding that the proof at a trial was sufficient under the precedents established in the MBF Corp., Fred's Stores, and Huseman Oil cases. I would hold that the verdict was against the overwhelming weight of the evidence.

II. Whether the trial court erred in allowing the damages testimony of Dr. Stan Smith to be heard by the jury.
¶ 91. At the time of trial the standard in Mississippi for the admission of expert witness testimony was the "general acceptance" test. Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923). Progressive asserts that the admission of Dr. Smith's testimony at trial constitutes reversible error under the Frye standard. Progressive further asserts that Smith's testimony failed to connect All Care's losses to Muench, was based on speculation and demonstrably false assumptions, and bore no relation to the evidence in violation of M.R.E. 402, 403, 702, or 703 for admissibility of expert testimony. Mississippi Transp. Comm'n v. McLemore, 863 So.2d 31, 35(¶ 7) (Miss.2003).
¶ 92. Dr. Smith's area of specialty is in testifying regarding hedonic damages. In fact, Dr. Smith has qualified as an expert in over 100 cases regarding hedonic damages and has written a text on the subject. Progressive correctly asserts that this case, requiring a calculation of lost future net profits for a commercial enterprise, obviously does not involve Smith's primary area of expertise. However, any discussion of Dr. Smith's area of expertise, or discussion of cases in which his methodology has been allowed or disallowed in regards *237 to hedonic damages is, as All Care asserts, irrelevant.
¶ 93. What is relevant to our inquiry is whether Dr. Smith's testimony in the trial court was admissible under Frye and the Mississippi Rules of Evidence. As we have stated, supra, the testimony of Dr. Smith must pass muster under the "general acceptance" test as laid out in Frye. Frye, 293 F. 1013 at 1014. More specifically, "a theory or method is not generally accepted when it is unique to a particular situation, not taught or discussed in courses or textbooks, `breaks new ground' and is not used by other practitioners in that particular field." Mississippi Transp. Comm'n, 863 So.2d at 42. In the case at hand, it cannot be said generally that the mere computation of lost future business is somehow unique or breaks new ground. However, the assumptions and facts that are the basis of Smith's testimony are of concern as to the efficacy of Smith's methodology. Also of concern is whether his testimony was relevant and assisted the trier of fact under M.R.E. 702.
¶ 94. Progressive challenges Smith's methodology on numerous grounds. Progressive correctly points out that Dr. Smith admitted that he had no idea why All Care's business declined, and offered no opinion that the decline was caused by Progressive. However, Dr. Smith did testify that All Care suffered a precise amount of losses beginning in 1997, and he extended his estimate ostensibly for thirty years. Moreover, Progressive argues that Smith, while offering no evidence or opinion on causation, also gave no consideration to the only proof of actual losses that Muench's conduct may have caused, namely the testimony of attorneys Priester, Stewart, Evans, and Pearson. In short, Dr. Smith, in estimating that All Care's future lost income of thirty years would total $16,430,932, relied simply on the information provided to him by All Care's sole shareholder, and attributed the entire failure of the business to the actions of Muench. All Care responds that Smith's role was simply to establish damages stemming from Muench's actions, but not to illuminate the cause of that decline. Considering the dearth of causation evidence provided prior to the testimony of Dr. Smith, All Care's argument is not well taken. Assuming for the sake of argument that All Care had presented sufficient causation testimony to show damages prior to the testimony of Dr. Smith, it is clear that All Care's argument that Muench was the sole cause of its business's failure is patently spurious. Such an argument is blatantly transparent, and to allow such an argument to prevail would be a vast injustice. Again, assuming that the prior witnesses had shown some measure of damages, their testimony could not support All Care's far-fetched contention that Muench's actions were the sole cause of All Care's demise. Dr. Smith should have been required to discount losses suffered by All Care due to other factors clearly affecting the business's failure.
¶ 95. In contending whether Dr. Smith's testimony was relevant and assisted the trier of fact, Progressive further argues that Dr. Smith undertook no research to determine the number of medical clinics that the Jackson market could support, or determined how many years such a clinic could operate. All Care responds that Dr. Smith testified that he had assumed that there was competition in Jackson, just not enough to keep All Care operating at full capacity. Again, All Care's argument is not well taken with this judge. It is clear from All Care's own business records that any competition was enough to keep All Care from operating at full capacity. Smith failed to account for other potential sources for All Care's lost income, or from the mitigation of damages *238 that ensued from the reopening of substantially the same clinic under a new name.
¶ 96. In concocting his lost profit figure, Dr. Smith assumed that All Care would run at top capacity and would receive 275 patients per week. This figure was, according to Dr. Smith, merely what Dr. Smith "just arbitrarily defined in discussion with Mr. Small that would be about the peak that he would have anticipated." There is no testimony in the record that All Care ever did, or did not, actually treat 275 patients in a given week. However, an examination of All Care's records and the trial transcript shows that All Care's average weekly clientele volume peaked at between 156 and 174 clients. This figure is a far cry from the 275 weekly client figure proposed by Dr. Smith, and should have raised the scrutiny of Dr. Smith's methodology as any assumption made must be grounded on a fair summation of the material facts in evidence and those material facts must be sufficient in scope, for the witness to formulate a rational opinion. Mississippi Transp. Comm'n v. McLemore, 863 So.2d at 36(¶ 8) (citing Hickox ex rel. Hickox v. Holleman, 502 So.2d 626, 638 (Miss.1987)).
¶ 97. Progressive argues that while Dr. Smith was extremely liberal in calculating the number of patients that All Care expected each week, he conversely utilized expense figures that were conservative at best, and constituted an example of deceptive low balling at worst. For example, Progressive argues that Dr. Smith assumed that All Care's rent would cost $28,000 annually, when in fact All Care's rent in 1995 alone was $78,000. Dr. Smith assumed telephone bills would cost about $6,000 per year, when All Care's 1995 phone charges totaled $24,656. Dr. Smith explained on cross-examination that since All Care was part of a family of medical providers, any disparity between his numbers and those on All Care's tax forms was because "sometimes one company would pay the expense[s] on behalf of another." While it is clear that All Care covered the negative of some expenses of its affiliates, there is little evidence to conclude to what extent All Care did so, and therefore there is little evidence to substantiate or denigrate the above expense figures. It is interesting to note that All Care's habit of paying the expenses of its underperforming sister-clinics may have attributed to its ultimate demise, a point not touched upon or explored by Progressive on appeal.
¶ 98. Progressive further argues, by examining All Care's tax returns, that one may deduce that medical supplies for patients cost three times the amount assumed by Dr. Smith, and that Dr. Smith underestimated the actual wages of All Care's physicians by at least $6,000 per physician. An examination of the transcript and exhibits would seem to indicate that the figures used by Dr. Smith as to medical supplies and physician's wages are less defensible than All Care's rent and phone expenses, as the discrepancies cannot be, and apparently were not, blamed on losses from other clinics. While these two factors alone cannot cast sufficient doubts upon Dr. Smith's findings, when these factors are taken in conjunction with his 275 patients per week figure, grave concerns are justified. The Mississippi Supreme Court held that it is an abuse of discretion to allow an expert's testimony that relied upon data that was "not reasonably accurate" as it was provided by plaintiff's counsel's estimates and not reflected on the plaintiff's records. APAC-Mississippi Inc. v. Goodman, 803 So.2d 1177, 1185 (¶ 30) (Miss.2002).
¶ 99. Progressive argues that it was All Care's burden to prove not a hypothetical future income that might have been *239 achieved in a world of no competition, perpetual corporate lifespan, and at full capacity performance every day of the week, and month, but, instead to prove a figure that corresponded to reality, with a lost profits calculation that fairly responded to the clinic's past experience.
¶ 100. Finally, Progressive argues that even if Smith's testimony was admissible under M.R.E. 702 or 703, it should have been excluded under Rule 403 of the Mississippi Rules of Evidence whereby "although relevant, evidence may be excluded if its probative value is substantially out-weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." M.R.E. 403. Progressive offers the following in support of its position:
Given the realities of litigation, the opinion of a witness impressed by the court with the label of "expert" may carry a great deal of weight with a lay jury, particularly in matters as complex as lost future earnings assessments. Permitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which Rule 403 defends.
Elcock v. KMart Corp., 233 F.3d 734, 756 (3rd Cir.2000).
¶ 101. All Care counters that Dr. Smith was certainly qualified due to his qualifications and experience as required by M.R.E. 702. All Care further asserts that Dr. Smith's testimony satisfied the second inquiry under M.R.E. 702, namely that his testimony was relevant and assisted the trier of fact. All Care argues that Smith's methodology was sound, and correctly states that the "calculation of lost net profits is beyond the ken of the average juror."
¶ 102. All Care argues that Progressive had ample opportunity to introduce its own expert at trial, and also points out that Dr. Smith was subject to lengthy cross-examination. All Care argues that a jury is at liberty to accept or reject expert testimony. Price v. Admiral Corp., 527 F.2d 412, 415 (5th Cir.1976). All Care argues that expert opinions need not be accepted by the jury as true, but are "purely advisory", and the jury may place whatever weight they choose upon the testimony and reject it, if they find that it is inconsistent with the facts in the case or otherwise unreasonable. United States v. An Easement and Right of Way Over 3.5 Acres of Land, Marshall County, Mississippi, 457 F.Supp. 1048, 1051 (D.C.Miss.1978). See also, Carter v. State, 310 So.2d 271, 272 (Miss.1975). Lastly, All Care points out that "the fact that the jury awarded only one year of lost future revenue demonstrates that the jury understood that they were allowed to adjust the calculation."
¶ 103. While it is true that Dr. Smith's primary area of expertise is in the field of hedonic damages, it cannot be said that due to this fact alone the trial court abused its discretion in finding that Dr. Smith was qualified to testify regarding lost profits under the first prong of M.R.E. 702 and Frye. It is apparent that Dr. Smith's general formula for calculating profits was not unreasonable. What was unreasonable was the underlying assumptions and facts that he plugged into his equation, an issue that greatly affects whether his testimony assisted the trier of fact under the second prong of M.R.E. 702.
¶ 104. Just because an expert is subject to cross-examination does not pre-suppose that the witness will be of assistance to the trier of fact. While a trial court has considerable leeway in deciding whether expert testimony is reliable, the court must be wary of the fact that expert testimony based upon speculative information may convey "a delusive impression of exactness in an area where a jury's common sense is *240 less available than usual to protect it." Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 145 (4th Cir.1994). "The trial court is vested with a `gatekeeping responsibility.'" Mississippi Transp. Comm'n, 863 So.2d at 36 (¶ 11). "The trial court must make a `preliminary assessment of whether the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue.'" Id. This issue of the role of the trial judge as gatekeeper became a point of contention in the record during Progressive's motion in limine to exclude Dr. Smith from testifying. The exchange went as follows:
Progressive: If I could add just one thing, Your Honor. The cases cited in our brief also point out that with respect to expert testimony that is based on information that's provided to the expert specifically for litigation by a party to the litigation, that testimony should be scrutinized especially closely because a jury will tend to rely on an expert's opinion just because he's labeled an expert. So we would say that the risk of prejudice is especially great. And we would also say that Dr. Smith's deposition....
Court: As in any case, the Court gives Jury instructions regarding expert testimony where the jury is free to believe the witness or not believe the witness. It's the jury's duty to determine the credibility of this witness and these instructions will be given in this case as well.
¶ 105. While the trial court did not misstate the law regarding the role of the jury in dealing with expert testimony presented before it, the exchange illustrates that the trial judge completely abdicated his role as gatekeeper, instead relying solely on the discretion of the jury. The above exchange constitutes a clear abuse of discretion by the court. The trial court had credible evidence before it that Dr. Smith's formula overestimated the number of patients seen by All Care by over 100 patients per week. It is well settled that a party may not assume facts not in evidence or otherwise unsupported by the evidence, or omit material undisputed facts as a basis for arriving at an expert opinion. Magnolia Hospital v. Moore, 320 So.2d 793, 799 (Miss.1975). Dr. Smith's calculations wholly failed to account for any other causes of All Care's decline which, despite All Care's contention that Dr. Smith need not have considered causation, was necessary in order to assist the jury in finding a "fair and approximate" measure of damages. What is more, Dr. Smith did not undertake any market studies to determine All Care's prognosis for future business, and he failed to even consider quantifiable damages based upon the specific testimony of the four personal injury attorneys.
¶ 106. All Care itself admitted that calculation of lost net profits is beyond the ken of the average juror. This point seems clear, yet despite this fact the trial judge allowed Dr. Smith and his lost profit figure of $16,430,942 to go before the jury. The jury was expected to determine what measure of damages to All Care were actually caused by Muench's actions without a proper showing of causation. The jury was expected to conjure up an estimate of damages from the muddled testimony of the four personal attorneys. The jury was expected to reduce a damages figure that was the result of obviously faulty facts and assumptions, as relied on by Dr. Smith in his calculation of the lost profits formula. If this burden was not beyond the ken of the average juror, it would be hard to establish what greater burden could be asked of the men and women serving on Mississippi's juries. That the jury in fact reduced the damages figure from, what *241 was according to Dr. Smith thirty years worth of lost profits, to instead a figure representing one year's worth of lost profits, or $1,430,000 in damages, cannot save this judgment.
¶ 107. In essence, the jury was given a single lost profit figure that was obviously inflated, and was forced to reduce the outrageous figure as best it could. The jury obviously did not agree that Muench was the sole cause of All Care's decline, a proposition that was the basis for All Care's tenuous position that Dr. Smith did not need to consider causation. Ultimately, in putting before the jury a figure that was inflated due to Dr. Smith's reliance on the faulty figure of 275 potential clients per week, a figure that attributed one-hundred percent of All Care's losses to Muench, All Care seeks to have its cake and eat it too. It seeks to put testimony of damages before the jury with the starting assumption that Muench is the sole cause of that damages figure. However, All Care next argues that the jury was free to reduce the damages due to any insufficient showing of causation, or any errors in Dr. Smith's computation. The jury ultimately awarded, in essence, one thirtieth of the damages figure that All Care proffered. Is it not fair to conclude that the jury found that Muench was responsible for only one thirtieth of the causation in All Care's decline? And if this is so, is the fact that the damages awarded were one thirtieth of an inflated starting figure enough to conclude that the figure is a "fair and approximate" measure of the harm caused by Muench? I think not. It is clear that the trial judge asked the jury to do precisely that which precedent tells us juries are least prepared to do. Namely, the jury was asked to venture into the quagmire of lost profits calculations due to the patent inadequacy of Dr. Smith's testimony.
¶ 108. The jury was asked to take it upon itself to generate a figure for lost profits because of, or perhaps in spite of, All Care's inadequate proof of causation and Dr. Smith's obviously flawed formula. How Dr. Smith could have assisted the trier of fact, beyond providing a large starting figure that a jury could only work backwards from, is unfathomable. That the jury chose to use Dr. Smith's figure at all is easily attributed to the tendency in all juries to rely on the testimony of those labeled experts, as well as the fact that the figure represented the only starting point provided by All Care from which a jury could determine damages whatsoever. As such, Dr. Smith's testimony clearly fails the second prong of M.R.E. 702. Furthermore, due to Dr. Smith's unsupported assumptions, he clearly did not rely on a methodology that is "generally accepted" under the Frye test, and thus his testimony should have been excluded.
¶ 109. Finally, assuming for the sake of argument that Dr. Smith's testimony satisfied M.R.E. 702, and Frye's "general acceptance" test, Dr. Smith's testimony still must pass through the ultimate filter for admissibility, M.R.E. 403. As stated previously, a large portion of Dr. Smith's methodology was unsupported, if not directly contradicted, by the facts in evidence. "Permitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading a jury and confusing the issues, the very dangers against which Rule 403 defends." Elcock, 233 F.3d at 756-57. It is readily apparent that Smith's opinion, based upon demonstrably false assumptions and speculation, was unhelpful to the jury in establishing requisitely "approximate" damages. Furthermore, Dr. Smith's opinion was certainly afforded undue weight by the jury by virtue of the fact that it was the only specific damages testimony heard by the jury, and *242 thus must assuredly fail the M.R.E. 403 inquiry as unduly prejudicial to Progressive. Because the majority has decided to affirm this issue in favor of All Care, I must respectfully voice my dissent.
CHANDLER, J., JOINS THIS SEPARATE WRITTEN OPINION AND GRIFFIS, J., JOINS AS TO ISSUES II AND III.
NOTES
[1] Since that time, the Mississippi Supreme Court adopted the rule as stated in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and as modified in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). McLemore, 863 So.2d at 34. Since the Frye "general acceptance" test was the controlling law at the time of trial, an examination of Daubert is unnecessary.