963 So.2d 1284 (2007)
Marie BATEMAN and Lawrence Pelletier d/b/a Magic Wiggler Worm Ranch, Appellants,
v.
Martin T. GRAY, Sr. and Martin T. Gray, Jr., Appellees.
No. 2006-CA-01441-COA.
Court of Appeals of Mississippi.
September 4, 2007.
*1286 James L. Martin, Madison, attorney for appellants.
John Denver Fike, attorney for appellees.
Before KING, C.J., GRIFFIS, BARNES and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. This is an interference in business relations case. On behalf of their business, Magic Wiggler Worm Ranch, Marie Bateman and Lawrence Pelletier sued Martin Gray, Sr. and Martin Gray, Jr. and claimed the Grays interfered in Magic Wiggler's business relationship with Cal-Maine Farms. The Grays successfully moved for summary judgment. Aggrieved, Magic Wiggler appeals and claims the circuit court erred when it granted the Grays' motion for summary judgment. Additionally, Magic Wiggler claims the trial judge erred when he did not recuse himself. Finding no error, we affirm.

FACTS
¶ 2. Marie Bateman and Lawrence Pelletier established Magic Wiggler Worm Ranch on a ten acre tract of property in Raymond, Mississippi. Over time, Magic Wiggler's operation grew to the point that it required 30,000 pounds of cow manure per week. Magic Wiggler acquired manure pursuant to a verbal agreement with Cal-Maine Farms.
¶ 3. On June 20, 2003, Bateman and Pelletier visited Martin Gray, Jr. They wanted to borrow Gray's front end loader to unload their weekly load of manure. Two days later, Martin Gray, Sr. visited Magic Wiggler. According to Bateman and Pelletier, Gray asked many questions about the worm farm. The next day, Bateman and Pelletier went to Cal-Maine to pick up their weekly load of manure. According to Bateman and Pelletier, they were told that, because the Grays had complained that Magic Wiggler generated excessive flies, Cal-Maine would not give any more manure to Bateman and Pelletier. Further, a Cal-Maine employee told Bateman and Pelletier that the Mississippi Department of Environmental Quality could fine Cal-Maine $20,000 if the Grays complained.
¶ 4. Bill Gill, the manager of Cal-Maine's dairy farm, told Bateman and Pelletier to talk to the Grays and that, if the Grays did not mind, Cal-Maine would continue supplying Magic Wiggler with manure. Bateman and Pelletier spoke with Martin Gray, Jr. As a result, Martin Gray, Jr. said he would call Gill and tell him to resume supplying manure.
¶ 5. Bateman and Pelletier contacted MDEQ and requested an inspection. A representative of the MDEQ solid waste division inspected Magic Wiggler and, according to Bateman's affidavit, the representative concluded that Magic Wiggler was in compliance with MDEQ regulations.
¶ 6. Meanwhile, Gill resumed supplying Magic Wiggler with manure. On August 26, 2003, Bateman and Pelletier went to Cal-Maine to pick up a load of manure. Gill told Bateman and Pelletier that Martin Gray, Jr. had complained again. As such, Gill would not supply Magic Wiggler with manure. Bateman explained that *1287 MDEQ had inspected the property and found it satisfactory. Regardless, Gill maintained that Cal-Maine would no longer supply Magic Wiggler with manure.
¶ 7. Bateman and Pelletier contacted the Mississippi Department of Health and requested an inspection. On September 5, 2003, MDH inspected Magic Wiggler's property and, according to Bateman's affidavit, MDH found no evidence of flies. According to Bateman and Pelletier, they had no other supply of manure and, as a result, they lost all their worms and ceased to operate.

PROCEDURAL HISTORY
¶ 8. On August 23, 2004, Bateman and Pelletier filed a complaint on behalf of Magic Wiggler in the First Judicial District of the Hinds County Circuit Court. Bateman and Pelletier sued for "tortuous interference with business relations" and "intentional tort." They requested $7,790,000 in compensatory damages and $1,000,000 in punitive damages. The Grays denied liability.
¶ 9. On March 29, 2006, the Grays filed a motion for summary judgment. Following a hearing, the circuit court granted the Grays' motion for summary judgment. Bateman and Pelletier appeal.

ANALYSIS
I. WHETHER THE CIRCUIT COURT ERRED WHEN IT GRANTED THE GRAYS' MOTION FOR SUMMARY JUDGMENT.
¶ 10. Magic Wiggler claims the circuit court erred when it granted the Grays' motion for summary judgment because genuine issues of material fact existed. According to Magic Wiggler, the predominant issue of material fact is whether Magic Wiggler's operations generated excessive flies.
¶ 11. We conduct a de novo review of a circuit court's decision to grant summary. Baldwin v. Holliman, 913 So.2d 400(¶ 17) (Miss.Ct.App.2005). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact." M.R.C.P. 56(c). We must also consider the evidence in the light most favorable to the non-moving party. Baldwin v. Holliman, 913 So.2d 400(¶ 17) (Miss.Ct.App.2005).
¶12. For summary judgment purposes, a fact is "material" if it tends to resolve any of the issues properly raised by the parties. Id. at (¶ 18). A mere allegation by the non-moving party that a dispute over whether a material fact exists will not defeat a movant's otherwise properly supported motion for summary judgment. Id.
¶ 13. To prove a prima facie claim of tortious interference with a business relationship, a plaintiff must prove that:
(1) the acts were intentional and willful;
(2) the acts were calculated to cause damage to a plaintiff in its lawful business;
(3) the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and
(4) actual damage and loss resulted.
Progressive Cas. Ins. Co. v. All Care, Inc., 914 So.2d 214, 218-19(¶5) (Miss.Ct.App. 2005).
¶ 14. Bateman and Pelletier alleged that the Grays intentionally interfered in *1288 Magic Wiggler's verbal agreement relationship with Cal-Maine. When the Grays filed their motion for summary judgment, they attached Gill's affidavit as an exhibit. Gill was the director of Cal-Maine Farms's dairy division at the time Cal-Maine stopped supplying Magic Wiggler with manure. By his affidavit, Gill swore that, "out of kindness and generosity," he allowed Cal-Maine's dairy division to give Bateman and Pelletier manure for use on Magic Wiggler's worm farm. Gill also swore that Martin Gray, Sr., Martin Gray, Jr., and Don Nail complained that Magic Wiggler produced excessive flies.
¶ 15. Gill went on to say that he told Bateman and Pelletier that Cal-Maine would not provide any more manure based on the possibility that the manure caused fly problems. Because Bateman and Pelletier maintained that there was no fly problem, Gill sent a Cal-Maine employee to inspect Bateman and Pelletier's property. That employee reported that there were "fly issues" on Bateman and Pelletier's property.
¶ 16. Gill noted that, in September of 2003, Martin Gray, Sr. and Martin Gray, Jr. both called him and told him that they had no objections to Cal-Maine providing Magic Wiggler with manure. Even so, Gill decided that Cal-Maine would not supply Magic Wiggler with any more manure. Gill reached his decision based on the following reasons:
Prior to [complaints by the Grays and Don Nail], I had been informed and noticed that Bateman and Pelletier's trailer, in which we loaded the manure upon, was not water tight and that there was manure spillage on the Cal-Maine driveway as the manure loaded trailer was being transported from the Cal-Maine Dairy to the Bateman and Pelletier's worm farm.
* * *
Considering the amount of cow manure disposed of by Bateman and Pelletier was not a significant percentage of the amount of cow manure produced by the Dairy, it soon became a nuisance to the Dairy to stop work and load Bateman and Pelletier's trailer.
* * *
However, by [the time the Grays said they had no objections to Cal-Maine's supplying Magic Wiggler with manure], I had decided that it was not advantageous for Cal-Maine to continue supplying Bateman and Pelletier with manure due to the hassle involved and the potential to create bad publicity for and ill will toward Cal-Maine Farms, Inc.
* * *
Cal-Maine Farms, Inc. Dairy Division's decision to discontinue providing Bateman and Pelletier with cow manure was not the result of Martin T. Gray, Sr. and/or Martin T. Gray, Jr.'s complaints about excessive flies on Bateman and Pelletier's farm.
* * *
Martin T. Gray, Sr. and/or Martin T. Gray, Jr. have never threatened to sue Cal-Maine Farms, Inc. Dairy Division nor have they threaten[ed] to report Cal-Maine Farms, Inc. Dairy Division to the Mississippi Department of Environmental Quality.
¶ 17. When Bateman and Pelletier responded to the Grays' motion for summary judgment, they attached six documents to support their position. Bateman's affidavit set forth her version of events. Three of Bateman and Pelletier's neighbors signed affidavits and swore that Magic Wiggler never caused them to have problems *1289 with flies. Notably, Bateman and Pelletier included the affidavit of Willie Thompson. Thompson was the Cal-Maine employee that Gill sent to inspect Magic Wiggler's property. Thompson's affidavit was in direct contrast to Gill's affidavit on one point in particular. According to Thompson, when he inspected Magic Wiggler's property, he "did not see any fly problem." Finally, Bateman and Pelletier included a letter from Jerome Goddard, Ph.D., a medical entomologist employed by the Mississippi State Department of Health. According to Dr. Goddard, he inspected Magic Wiggler's property and, as of September of 2003, he found no evidence of excessive flies.
¶ 18. At the summary judgment hearing, the Grays argued that summary judgment was appropriate because Bateman and Pelletier could not contradict Gill's contention that he did not stop giving manure to Magic Wiggler because of the Grays. Instead, Gill stopped giving manure to Magic Wiggler because: (1) Bateman and Pelletier's trailer allowed manure to spill out on Cal-Maine's driveway, (2) Bateman and Pelletier only used a fraction of the manure produced by Cal-Maine's dairy farm, and (3) it was a nuisance to stop operations at Cal-Maine to load Bateman and Pelletier's trailer.
¶ 19. Bateman and Pelletier focus their position on the premise that there was a genuine issue of material fact as to whether Magic Wiggler generated excessive flies. That may very well be, but there is no dispute that the Grays withdrew their complaint regarding flies on Magic Wiggler's property. That is, the Grays told Gill that they had no problem with Cal-Maine supplying Magic Wiggler with manure.
¶ 20. Gill stated the reasons behind his decision to stop giving manure to Bateman and Pelletier. None of those reasons involved the Grays or any complaint of excessive flies. Instead, Gill stopped giving manure to Bateman and Pelletier because they spilled it on Cal-Maine's property when they left, because it was a fraction of the amount that Cal-Maine produced, and because loading their trailer interrupted their normal operations.
¶ 21. Assuming, for the sake of discussion, that Gill stopped giving Bateman and Pelletier manure because of the Grays' complaints, there is no evidence, beyond bare accusation, that the Grays complained to Cal-Maine "with the unlawful purpose of causing damage and loss" or that they complained "without right or justifiable cause." Progressive, 914 So.2d at 218-219(¶ 5).
¶ 22. A mere allegation by the non-moving party that a dispute over whether a material fact exists will not defeat a movant's otherwise properly supported motion for summary judgment. Baldwin, 913 So.2d at (¶ 18). While there may be a dispute regarding whether Magic Wiggler's operations generated excessive flies, there is no genuine issue of material fact as to whether the Grays calculated to cause damage to Magic Wiggler. Likewise, there is no genuine issue of material fact as to whether the Grays acted maliciously. Even if we assume facts in the light most favorable to Magic Wiggler, the undisputed evidence shows only that the Grays complained. Magic Wiggler presented no evidence of the Grays' intent. Accordingly, we cannot find that the circuit court erred when it granted the Grays' motion for summary judgment.
II. WHETHER THE TRIAL JUDGE ERRED WHEN HE DID NOT RECUSE HIMSELF SUA SPONTE.
¶ 23. Magic Wiggler claims the trial judge should have recused himself. *1290 Magic Wiggler did not file a motion to recuse. Uniform Circuit and County Court Rule 1.15 states: "Any party may move for the recusal of a judge . . . if it appears that the judge's impartially might be questioned by a reasonable person knowing all the circumstances, or for other grounds provided in the Code of Judicial Conduct or otherwise as provided by law." However, one must do so within thirty days "following notification to the parties of the name of the judge assigned to the case." "[I]f it is based upon facts which could not reasonably have been known to the filing party within such time, it shall be filed within 30 days after the filing party could reasonably discover the facts underlying the grounds asserted." Id.
¶ 24. According to Magic Wiggler, the trial judge had a personal relationship with Martin Gray, Sr. in that the trial judge attended meals at Martin Gray, Sr.'s lodge "on numerous occasions." Magic Wiggler submits that it did not know of the trial judge's association with Martin Gray, Sr. prior to the final judgment in this matter. However, as the Grays point out, according to a portion of Magic Wiggler's website, "[w]e already know the judge assigned to our case, knows the defendants personally well, so our chances for a change of venue do not look promising."[1] Pursuant to Magic Wiggler's own website, Bateman and Pelletier doubted the trial judge's impartiality during the litigation at trial level.
¶ 25. Assuming, for the sake of argument, that Bateman and Pelletier could not have reasonably brought their allegation before the trial judge, we are still not inclined to reverse. "This Court presumes that a judge, sworn to administer impartial justice, is qualified and unbiased." Hathcock v. S. Farm Bureau Cas. Ins. Co., 912 So.2d 844(¶ 9) (Miss.2005). "To overcome the presumption, the evidence must produce a `reasonable doubt' (about the validity of the presumption); that is, one must question whether `a reasonable person, knowing all of the circumstances, would harbor doubts about the judge's impartiality." Id. One may overcome this presumption "only by showing beyond a reasonable doubt that the judge was biased or unqualified." Id. Further, "In determining whether a judge should have recused himself, this Court must consider the trial in its entirety and examine every ruling to determine if those rulings were prejudicial to the moving party." Id. at (¶ 11).
¶ 26. "No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties." Article 6, Section 165 of the Mississippi Constitution of 1890. Pursuant to Miss.Code Ann. § 9-1-11 (Rev 2002):
The judge of a court shall not preside on the trial of any cause where the parties, or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, or wherein he may have been of counsel, except by the consent of the judge and of the parties.
¶ 27. There is no evidence that the trial judge was connected with the Grays by affinity or consanguinity. Likewise, there is no evidence that the trial judge had an interest in the outcome. Rather, all that is before us is Bateman and Pelletier's bald allegation that the trial judge was partial *1291 to the Grays because he ate at the Grays' lodge at some time on some vague and undetermined occasions. What is more, the context of those meals is entirely undeveloped. The record contains nothing but Bateman and Pelletier's vague allegation.
¶ 28. Pursuant to Canon 3(E) of the Code of Judicial Conduct, "[j]udges should disqualify themselves in proceedings in which their impartiality might be questioned by a reasonable person knowing all the circumstances or for other grounds provided in the Code of Judicial Conduct or otherwise as provided by law." Canon 3(E)(1)(a) states that a judge should disqualify himself if "the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." "In the absence of a judge expressing a bias or prejudice toward a party or proof in the record of such bias or prejudice, a judge should not recuse himself." Hathcock, 912 So.2d at 852(¶ 23). As in Hathcock, the record contains no evidence that the trial judge had a personal bias or prejudice concerning either Bateman and Pelletier or the Grays. Similarly, the record contains no evidence that the trial judge had personal knowledge of disputed evidentiary facts. In light of Bateman and Pelletier's untimely vague and obscure allegations, without more, we cannot find reasonable doubt as to the trial judge's impartiality. Accordingly, we find no reversible error.
¶ 29. THE JUDGMENT OF THE FIRST JUDICIAL DISTRICT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] http://www.magicwiggler.com/Suit.htm.